Marcos **HERNANDEZ**

v.

**NAVIERA MERCANTE, C.A., et al.**

**Civ. A. No. 87–2484.**

United States District Court,
E.D. Louisiana.

June 29, 1989.

Michele Gaudin and Salvador G. Longoria, Gaudin & Longoria, New Orleans, La., for plaintiff.

R. Henry Sarpy, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, and Robert H. Murphy and Peter B. Sloss, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for defendants.

## ORDER AND REASONS

PATRICK E. CARR, District Judge.

This matter is before the Court on defendant's, West of England's Shipowners Mutual Insurance Association, Luxumberg, Motion to Dismiss for Forum Non Conveniens and Motion to Dismiss Claims under United States Law applying choice of law principles. After considering the memoranda of the parties, the record and the law applicable to this case, the Court hereby renders its order and reasons.

The plaintiff, Marcos Hernandez, was injured on January 25, 1985, on the Seventh Street Wharf in New Orleans, Louisiana while working as a seaman and member of the crew of the M/V RIO CAPAYA. The plaintiff was employed by Naviera Mercante who was the owner of the vessel at the time of the accident. Plaintiff was injured when a gangplank he was using to reboard the vessel gave way causing him to fall into the Mississippi River. The plaintiff had disembarked from the vessel across a barge which was under the control of the defendant, ITO Corporation and from that barge onto the wharf. As the plaintiff was reboarding the vessel by way of two planks extending from the barge to the wharf, these planks gave way causing the plaintiff to fall. The plaintiff has brought Jones Act, unseaworthiness and general maritime negligence claims against Naviera Mercante, ITO Corporation, and their insurers. The plaintiff has also brought a claim for maintenance and cure and payment of wages and penalties against his employer, Naviera Mercante.

Service of process has not been confected on Naviera Mercante, a Venezuelan corporation. West of England's Shipowners Mutual Ins. Assoc., Luxumberg, [West of England] is the insurer for Naviera Mercante, and is a direct defendant in this action defending the claims against the vessel owner, Naviera Mercante.

After his injury, the plaintiff was hospitalized in New Orleans and then repatriated to Venezuela upon his discharge from the hospital on January 31, 1985. The plaintiff was given $50.00 for repatriation expenses which was deducted from his base pay upon returning to Venezuela. The plaintiff has testified that he received his base wages from Naviera Mercante upon his return to Venezuela. However, plaintiff claims that his employer has not paid unearned wages to the end of the voyage, unpaid earned wages at the completion of the voyage, overtime pay and other benefits. Because of this, plaintiff also seeks wage penalties.

### West of England's Motion to Dismiss for Forum Non Conveniens

Since jurisdiction over a wage claim made in good faith under 46 U.S.C. § 10313 is mandatory regardless of whether there is a more convenient foreign forum, this court must first determine whether plaintiff's wage claim has been brought in good faith. *Abraham v. Universal Glow, Inc.*, 681 F.2d 451 (5th Cir.1982); *Dutta v. Clan Grahan*, 528 F.2d 1258 (4th Cir.1975); *Morewitz v. Andros Compania Maritima, S.A.*, 614 F.2d 379 (4th Cir. 1980). If there is jurisdiction over the wage claim, the court is also required to

entertain personal injury claims made in the same suit and dispose of the entire case on the merits. *Abraham,* at 453.[1]

The plaintiff alleges that Naviera Mercante has violated 46 U.S.C. § 10313 by failing to include overtime and failing to extend payments to the end of the voyage, as well as deducting the $50.00 repatriation expense money.[2] In support of this contention, the plaintiff submits his deposition testimony wherein he testifies at pages 53 and 54 that the $50.00 repatriation expenses were deducted from his wages, that he received only his base wages, but no overtime or other benefits from his employer after he was injured and unable to work. The plaintiff does not submit any documentary evidence concerning failure to pay overtime, unearned wages to the end of the voyage and unpaid earned wages at the completion of the voyage. Plaintiff also contends that he was not paid within the time period required under § 10313.

The defendant argues that the plaintiff does not have a good faith wage claim within the meaning of 46 U.S.C. § 10313. The defendant does not dispute that the

plaintiff had the $50.00 repatriation expenses deducted from his wages upon his arrival in Venezuela. The defendant does not submit any evidence with regard to plaintiff's allegations that he is due overtime pay, unpaid earned wages and unpaid unearned wages, but argues that plaintiff is not entitled to these payments under Venezuelan law.[3]

The Fifth Circuit in *Abraham,* supra, has noted that a District Court enjoys wide latitude in determining whether a wage claim is asserted in good faith. The good faith issue presents a factual question, which finding will not be disturbed unless it is clearly erroneous. The Fifth Circuit cited with approval the cases of *Morewitz* and *Dutta,* supra, which explained the good faith test in the context of a wage claim under § 10313. The Fourth Circuit in *Morewitz,* stated that:

"In the present context, the use of "good faith", a term associated with presence or absence of motive, does not seem apt when the resolution is in terms of whether the claim is one which will succeed or not. As pointed out in *Dutta v. Clan Grahan,* supra, 528 F.2d at 1260: "A

---

1. Because of such a bare record, the Fifth Circuit, in *Abraham,* remanded the case for determination of whether plaintiff's wage claim was brought in good faith.

2. 46 U.S.C. § 10313 states in pertinent part that:
   "(e) After the beginning of the voyage, a seaman is entitled to receive from the master, on demand, ½ of the balance of wages earned and unpaid at each port at which the vessel loads or delivers cargo during the voyage. A demand may not be made before the expiration of five days from the beginning of the voyage, not more than once in five days, and not more than once in the same port on the same entry. If a master does not comply with this subsection, the seaman is released from the agreement and is entitled to payment of all wages earned ...
   (f) At the end of a voyage, the master shall pay each seaman the balance of wages due the seaman within twenty-four hours after the cargo has been discharged or within four days after the seaman is discharged, whichever is earlier. When a seaman is discharged and final payment of wages is delayed for the period permitted by this subsection, the seaman is entitled at the time of discharge to ⅓ of the wages due the seaman.
   (g) When payment is not made as provided under Subsection (f) of this section without

sufficient cause, the master or owner shall pay to the seaman two day's wages for each day payment is delayed.
   \*   \*   \*   \*   \*   \*
   (i) This section applies to a seaman or a foreign vessel in a harbor of the United States. The courts are available to the seaman for the enforcement of this section."

3. The defendant relies on the Fifth Circuit case of *Henry v. S/S BERMUDA STAR,* 863 F.2d 1225 (5th Cir.1989), for his argument that when foreign law is to be applied it is applicable to the wage claim as well. However, in *Henry,* the parties stipulated that Panamanian law would apply. There was no choice of law issue in the case. In fact, the court did examine the effect of 46 U.S.C. §§ 10313-16 on the wage claim brought by Henry. The Court stated that:
   "The BERMUDA STAR falls nominally within the commands of 46 U.S.C. 10313-16 because it operated in and out of U.S. ports. Under these United States statutes a foreign flag shipowner, upon entry into a United States port, is faced with the prospect of potential statutory penalties ..."
   *Henry* dealt with temporary withholdings of wages from a seaman. The court found that the legislative intent behind the wage statutes was not directed against such a policy.

claim may be asserted in good faith even though it ultimately may be found to be unmeritorious". Nevertheless under the circumstances prognostigation as to probable success or lack of success of the action is a surer technique for assessing good faith than any other. Concentration of prospects of success is reasonable where jurisdiction of another claim exists only on a pendant basis. To keep the tail from wagging the dog, it is sound judicially to make sure that the claim on which jurisdiction depends is not entirely devoid of any prospect of success.

In *Dutta v. Clan Grahan*, the fact that the wage claims were "weak" was not deemed sufficient to establish lack of good faith. Here the determination goes further, i.e., it is that the wage claims cannot succeed. Such a determination suffices as support for the District Court's finding of lack of good faith." *Id.* at 382 n. 4.

In *Morewitz*, the plaintiffs had signed valid releases of their wage claims and thus, there was no way the plaintiffs case could succeed. Accordingly, the court there, found that the plaintiff's wage claims were not in good faith. However, the court indicated that a failure to reimburse $54.78, advanced to the plaintiff and then later deducted, would have been a good faith wage claim, but for the fact that the plaintiff's heirs had signed a release of all such wage claims. The court stated that:

"We do not find erroneous the District Court's determination that the release executed by the heirs pretermits a finding that the wage claim has been asserted in good faith." Id. at 382.

\* \* \* \* \* \*

"In sum, none of appellant's contentions designed to overcome the bar of the release, all of which were advanced and rejected below, persuades us to upset the District Court's finding that the wage claim is not asserted in good faith." Id. at 383.

In *Vlachos v. M/V PROSO*, 637 F.Supp. 1354 (D.Md.1986), the court relying on *Morewitz* and *Dutta,* stated that:

"The question that this court must therefore answer [with regards to a good faith wage claim] is not whether plaintiff's claims are weak, but whether there is no way—or just about no way—in which they may succeed."

There, the plaintiff, while being hospitalized for his injuries, received $3000 in wages and a voucher for the remaining wages owed him. The voucher was payable in Greece, but was never cashed because plaintiff did not return to Greece or send the voucher to Greece. Subsequently, defendants offered cash payment to plaintiff conditioned on the release by plaintiff of his wage claims. The court found that § 596 (recodified as § 10313) requires payment of unearned wages within certain time periods and recovery of penalties if the unearned wages are withheld without sufficient cause. The court concluded that this language allowed a wage claim to be stated under § 596 even if the defendants are able to show that there was sufficient cause for withholding the wages. The court held that:

"In any event, there being no question that as of the time the complaint was filed, the plaintiff had a right to recover at least the unpaid wages. Plaintiff's complaint states a meritorious claim under § 596. Accordingly, under the good faith test stated in *Dutta* and *Morewitz* plaintiff's claim was made in good faith and this court must take jurisdiction over the wage claims herein." Id. at 1360.

In the present case, the plaintiff's claim is very similar to that in *Morewitz*, the evidence supports the finding that the plaintiff's claim for unpaid wages was made in good faith. It is undisputed that the plaintiff was given $50.00 in repatriation expenses which was later deducted from his wages upon his return to Venezuela. Although the defendant argues that under Venezuelan law, the plaintiff received more than he was due, the defendant omits any discussion of Venezuelan law with regards to any obligation to repa-

triate seamen. Accordingly, the court finds that the plaintiff's claim for unpaid wages is meritorious within the meaning of 46 U.S.C. § 10313. Consequently, this finding does not require the court to reach the issue of forum non conveniens since jurisdiction of a good faith wage claim is mandatory and the court must retain jurisdiction of all other claims in the case.

### West of England's Motion to Dismiss Claims Under United States Law Applying Choice of Law Principles

The assumption by this court of jurisdiction over the non-wage claims does not mandate that these claims are automatically governed by United States law. *Vlachos,* supra at 1361. Rather, the analysis for determining the choice of law to be applied to these non-wage claims is determined by the application of the *Lauritzen/Romero/Rhoditis,* trilogy.[4] These cases set forth the following factors to govern a choice of law issue in a maritime action:

(1) place of wrongful act;

(2) flag of the vessel;

(3) domicile of the seaman;

(4) allegiance of the shipowner;

(5) place of the contract;

(6) accessibility of a foreign forum;

(7) law of the forum; and

(8) vessel owner's base of operations

The Supreme Court in *Rhoditis* emphasized that these factors were not exclusive and were not to be applied mechanically. The importance of any of the factors should be considered in light of the national interest served by the assertion of Jones Act jurisdiction. *Rhoditis* added the

eighth factor (shipowner's base of operations) and indicated that an alien owner with substantial business operations in this country might, by escaping his obligations as a Jones Act employer, be unfairly advantaged over citizens of this country engaged in the same business.

In the present case, with regards to the first seven factors listed above, the wrongful act occurred in New Orleans, the flag of the vessel is Venezuelan, the domicile of the plaintiff seaman, is Venezuela, allegiance of the shipowner is Venezuela, the place of the contract was Venezuela, it is presumed under the law that a foreign forum is accessible[5], and law of the forum is inapplicable in the case of an involuntary defendant.[6] At issue is the eighth factor, the vessel owner's base of operations.

■ Of little weight in the determination of choice of law is the place of wrongful act, domicile of the seaman, allegiance of the shipowner, and place of the contract. The law of the flag is of great weight in determining choice of law. "The law of the flag is the most venerable and universal rule of maritime law which overbears most other connecting events in determining applicable law." *Schexnider v. McDermott Intl, Inc.,* 817 F.2d 1159 (5th Cir.1987). However, even the law of the flag can be outweighed by some heavy counterweight such as a United States base of operations. The determination of whether American or foreign law applies turns substantially on the base of operations of the vessel owner. *Gonzalez v. Naviera Neptuno,* 832 F.2d 876 (5th Cir.1987). Accordingly, based upon the Fifth Circuit law, the two most important factors, in a choice of law question, are the flag of the vessel and the vessel owner's base of operations.

**4.** See *Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953); *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959) and *Hellenic Lines Ltd. v. Rhoditis,* 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970).

**5.** The plaintiff argues that a foreign forum is not available since prescription is jurisdictional and cannot be waived. However, the defendant controverts this with the affidavit of a Venezuelan attorney, Carlos Matheus, wherein he states that prescription can be renounced. This court

has recognized the adequacy of Venezuelan courts and dismissed claims in favor of Venezuelan forums under the doctrine of forum non conveniens. *De Marval v. M/V ARAGUA,* 808 F.2d 55 (5th Cir.1986). See also, *Chirinos de Alvarez v. Creole Petroleum Corp.,* 613 F.2d 1240 (3rd Cir.1980); *Villalobos v. Lofton Bros. Co.,* 507 F.Supp. 904 (S.D.N.Y.1981). Accordingly, the Court finds that a foreign forum is accessible.

**6.** See *Diaz v. Naviera Humboldt,* 722 F.2d 1216 (5th Cir.1984).

The base of operations has been defined by the case law as "where the foreign owner is engaged in extensive business operations in the United States." *Sosa v. M/V Lago Izabal,* 736 F.2d 1028 (5th Cir. 1984). The necessary operational contacts with United States must relate both to the ship and the owner and be substantial. *Id. De Marval v. The M/V Aragua,* supra, noted that a vessel owner's base of operations was where the corporate decision making took place.

In *Fisher v. Agios Nicolaos,* 628 F.2d 308 (5th Cir.1980) a ship was owned by a Liberian corporation, operated by a Panamanian Corporation and sailed under a Greek flag. The Panamanian Corporation was owned by citizens from Greece. The decedent was hired and flown from Greece to Beaumont, Texas to join the ship while the ship was in port. Shortly after the decedent became a member of the crew, an explosion occurred killing the decedent. The ship was under new ownership and on its maiden voyage from Spain to Beaumont where it had to load grain to transport to the Soviet Union. In determining the choice of law issue, the court found that prior to the accident the vessel's entire service under its present ownership and its entire revenues to be earned arose from a base of operations in the United States. *Id.* at 317. The court stated that:

> "This substantial use of United States base of operations for the shipping and revenues of the vessel and its owner, together with the other United States contacts (the latter of which may not by themselves have been sufficient for the

purpose), justify the choice of the Jones Act and of general maritime law as administered by American Courts as a more appropriate basis for decision than the Greek Compensation Law."

The Fifth Circuit held that the District Court properly resolved the choice of law question and found there was a sufficient nexus between the defendants and the United States to justify the application of American law. This nexus included an injury sustained in the United States, a substantial base of operations in the United States and substantial revenue from the United States trade. In that case the shipowner did not have an office in the United States and no revenues had yet been earned.

In *Sosa v. the M/V Lago Izabal,* 736 F.2d 1028 (5th Cir.1984) the court found that United States law should apply. The court held that there was a substantial base of operations in the United States. There, the vessel regularly loaded cargo in Texas. The court noted that a base of operations is established in part by the frequency of the shipowner's voyages beginning or ending in American ports.[7] All operations for management of a vessel were conducted out of the United States offices establishing a day-to-day operating location in the United States. Maintenance of the vessel was conducted in Texas and the vessel shipping agent was in Texas. Consequently, the Court found a Houston, Texas base of operations.

West of England relies on several Fifth Circuit cases, *namely, De Marval*[8], supra;

---

7. For a discussion with regards to the commercial nexus in shipping to or from ports of the United States in choice of law actions, see *Fajardo v. Tidewater, Inc.,* 707 F.2d 858, 861 n. 4 (5th Cir.1983).

8. In *De Marval,* the court found that Venezuelan law should apply. There, the injury occurred off the coast of Venezuela, the vessel was under a Venezuelan flag, the decedents were Venezuelan citizens, the owner of the vessel was a Venezuelan corporation, employment contracts were governed by Venezuelan law, and the owner's base of operations was in Venezuela. The plaintiff raised the issue of lack of discovery in obtaining facts that would establish a base of operations by the owner. The court stated that:

> "If discovery had uncovered a CAVN base of operations in the United States, that factor would not be controlling. It is undisputed that CAVN is a Venezuelan corporation owned by the Venezuelan government: corporate decision making took place in Caracas, Venezuela, despite the possible existence of an office in New Orleans."

However, that holding relied on the Fifth Circuit opinion in *Chiazor v. Transworld Drilling Co.,* 648 F.2d 1015, 1019 (5th Cir.1981) a platform case involving a choice of law issue. The Fifth circuit has made a distinction between an injury occurring on a platform and one occurring in the shipping context with regards to the choice of law issue and application of the *Lauritzen–Romero–Rhoditis* analysis. The Fifth Cir-

*Gonzalez* [9], supra; *Diaz* [10], supra, and *Volyrakis v. the M/V ISABELLE*, 668 F.2d 863 (5th Cir.1982) [11], to support their argument that Venezuelan law should apply. However, all of these cases are factually distinguishable in that the courts there found that the shipowner had no office located in the United States. In *Diaz* and *Volyrakis*, the court noted that a United States husbanding agent which negotiated cargoes, provided services such as arranging insurance, dock fees and supplies was insufficient to establish a base of operation in the United States.

Here, the contacts of Naviera Mercante with the United States establish a base of operations in the United States. Naviera did 100% of its business with United States ports; the vessel involved called exclusively at United States Gulf Ports, namely, Miami, Houston and New Orleans; all revenue of Naviera was obtained from the United States; all voyages originated or terminated in the United States; the owners had two offices with representatives of the owners manning these offices in the United States, namely New Orleans and Miami; in a letter from Naviera in Venezuela to Kerr Steamship it was stated that:

> "Captain Gonzales will work under the delegation of *our main representation office at Miami*, being his main responsibilities to *attend all of Naviamerica's interests* including the supervision of all vessels and crew affairs when the vessels call at U.S. Gulf Ports as well as other related matters with our enterprise in the area." (emphasis added).

Deposition testimony reveals that Gomez in Miami ran the operations, was notified if accidents occurred, was the link between Venezuela and the United States, and kept records. Solicitation letters were sent to Gomez from Kerr Steamship. Brokerage payments were made to Gomez in Miami. Publicity solicitation was made to Gomez in Miami; banking activities were conducted by Gomez in Miami. Tariff information and information concerning potential customers were also directed to Gomez in Miami.

The defendant counters these contacts with, first, a sworn conclusory statement by Leopoldo Gamboia, President of Naviera Mercante, that the day-to-day operations are conducted in Venezuela. Secondly, the defendant contends that the telex from Naviera in Venezuela to Kerr Steamship,

> cuit has noted in *Chiazor* that the place of the wrongful act, the domicile of the injured party and the place of the contract are much more significant than a base of operations when it involves a platform injury. See also, *Schexnider v. McDermott Intl, Inc.*, supra.

**9.** The *Gonzalez* court found that the law of Peru should be applied. There, the plaintiff's domicile, the contract, the flag, and owner, were Peruvian. The injury had occurred in the United States. With regards to the base of operations the court noted that there was no offices or general agents of the owner in the United States. The court stated that:

> "The mere fact that Neptuno vessels carried some cargo for delivery to the United States and occasionally called at ports in the United States to pick up outbound cargo does not justify a finding of an American base of operations. Neptuno was legitimately a Peruvian corporation, flying the Peruvian corporation, flying the Peruvian flag. This was not a situation where a sham corporation was founded in one country and vessels registered under that flag in order to obtain economic advantages. Nor is it one in which foreign principals maintain a residence in the United States, directing and controlling operations of the company's vessels worldwide. Neptuno's

> base of operations was certainly not in the United States."

**10.** In *Diaz*, the court found that foreign law should be applied. There the base of operations was determined to be outside the United States. The owners had no office or representatives in the United States, and managed daily activities from outside the United States. The court also noted that the mere use of husbanding agents or brokers was insufficient to establish a base of operations in the United States.

**11.** In *Volyrakis v. The M/V ISABELLE*, 668 F.2d 863 (5th Cir.1982) the court held that Greek law should be applied. There the vessel's flag was Greek, plaintiff was a Greek citizen, the vessel owner was Greek, the employment contract was confected in Greece, the injury occurred in the United States and the court found the base of operations to have been in Greece. The court there focused on the ownership of the vessel and noted that no shareholders were citizens of the United States, the owner had no office in the United States and the Directors and officers were Greek citizens. The court also noted that the United States agent which negotiated cargoes, provided agency services such as insurance, and supplies, did not establish a substantial base of operations in the United States.

the husbanding agent in New Orleans, which directed Kerr to issue a check and repatriate the plaintiff as well as the inter-office memo of Kerr Steamship discussing their proposal to Naviera Mercante establishes a base of operations in Venezuela. The defendant also relies upon the letter from Garcia in Venezuela (portion quoted above) to Kerr Steamship introducing Captain Gonzales as establishing that Venezuela is the situs for the corporate decision making. However, as noted above, this letter established a base of operations as to Naviamerica's interest in the United States. Lastly, the defendant relies upon the fact that the New York bank where the Naveria Mercante agents did business is a branch of a Venezuelan bank. Irregardless of whether this is a Venezuelan bank, the New York Bank is in the United States and signifies an additional contact by Naviamerica with this country.

The evidence relied upon by the defendant is insufficient to counter the significant commercial nexus that Naviera Mercante has with the United States. Accordingly, the court finds that Naviera Mercante has a substantial base of operations in the United States which outweighs the other *Lauritzen–Romero–Rhoditis*, factors. Consequently, this court holds that United States law should apply to this action.