Francisco **TISMO**, Taruc Jerry, Sam B. Sampiano, Tagnawa Salvador, Uldarico C. Bucaneg, Jr., Rufo A. Alday, Ireneo M. Taruc, Yolanda Condeno, Eduvigio A. Glorioso, Armando Gloria, Renato C. Cantal, James Catapusan, Antonio Ocumin, Jr., Edgardo S. Sisson and Aniceto G. Lacson, Plaintiffs,

v.

**M/V IPPOLYTOS,** Her Engines, Boilers, Tackle, Appurtenances, Cargo, etc., in rem; Prometheus Maritime Corp., Guise Shipping Enterprises Co. and Outlook Shipping, Ltd., in personam, Defendants.

Civ. A. No. 90–571.

United States District Court, D. New Jersey.

March 28, 1991.

Phillips Cappiello Kalban Hofmann & Katz by Paul T. Hofmann, Jersey City, N.J., for plaintiffs.

Freehill, Hogan & Mahar by Patrick J. Bonner, Newark, N.J., for defendants.

## OPINION

BISSELL, District Judge.

This matter arises before the Court on the basis of the defendants' various motions, made in the alternative:

(1) To dismiss the complaint under Fed. R.Civ.P. 12(b)(6);

(2) For summary judgment, dismissing the complaint;

(3) For summary judgment as to Count 2 of the complaint;

(4) For partial summary judgment and a determination of the date when the penalty wage period starts and ends;

(4) For summary judgment dismissing the claims of plaintiffs Sison, Ocumin, Cantal, Condeno, Sampiano, Alday and Bucaneg.

## I. FACTS AND BACKGROUND

The M/V Ippolytos is a Cyprus flag vessel registered in Nicosia, Cyprus, owned by defendant Outlook Shipping, Ltd. also of Nicosia. (Bonner (defense counsel) Aff., ¶¶ 2, 3; Hofmann (plaintiffs' counsel) Aff., ¶ 3). Each plaintiff is a Filipino seaman who, prior to June 1989, signed an individual employment contract to work on the ship. (*See e.g.* Defendants' Exh. A). These contracts were executed in The Philippines and approved by the Philippine Overseas Employment Agency ("POEA").

The governments of Cyprus and The Philippines entered into an Agreement on Merchant Shipping in 1984 ("the treaty"). The treaty provides, *inter alia*, for the resolution of disputes involving ships from one country and seamen from the other:

ARTICLE 10

(2) Any disputes arising out of the respective contract of employment between a shipowner of the one Contracting Party and a seaman of the other Contracting Party *shall be referred for settlement solely to the exclusive jurisdiction of the competent Court or Authorities, as the case may be, in the country of the seaman's nationality where the contract of employment was signed and approved.*

(*See* Defendants' Exh. E1) (emphasis added).

The individual employment contracts signed by the plaintiffs herein provide as follows:

THIS CONTRACT IS IN FORCE ACCORDING TO BILATERAL AGREEMENT SIGNED ON JULY 30, 1984 BETWEEN THE GOVERNMENT OF PHILIPPINES AND CYPRUS.

\* \* \* \* \* \*

SECTION H. APPLICABLE LAW AND JURISDICTION

It is understood and agreed that:

1. All rights and obligations of the parties to this Contract including the annexes thereof, shall be governed by the laws of the Republic of the Philippines, international conventions, treaties and covenants wherein the Philippines is a signatory;

2. The Philippines Overseas Employment Administration (POEA or Administration) *shall have original and exclusive jurisdiction over any and all disputes or controversies arising out of or by virtue of this contract.*

(Defendants' Exh. A) (emphasis added).

On June 27, 1989, Outlook Shipping and the Federation of Transport and General Workers of Cyprus (the "Cyprus Union") signed a Special Agreement ("the Agreement"). (*See* Plaintiffs' Exh. 7). The Agreement essentially provides that Outlook agrees to be bound by the Cypriot

collective bargaining agreement ("CCBA"). Accordingly, a "yellow certificate" was issued and directed to be placed on board, indicating that a collective agreement had been consummated. (*See* Defendants' Exh. G). Defendants claim that it was theirs and the Union's intent that only Cypriot crew members, not the Filipino seamen, would be paid wages in accordance with the CCBA. (Defendants' Br. at 1). This Court expresses no conclusion as to the strength of that claim. That agreement provides for a higher wage scale than that provided by the POEA contracts. The Cyprus Union is an affiliate member of the International Transport Workers Federation ("ITWF").

On February 7, 1990, plaintiffs filed a complaint in admiralty *in rem* and *in personam*. On the same date, this Court granted plaintiffs' request that the U.S. Marshal seize and attach by warrant the M/V Ippolytos "to perfect plaintiff's lien for wages, penalty wages, and transportation." Count One of the complaint asserts that the defendants failed to pay the plaintiffs' wages in the sum of approximately $90,000.00. Count Two asserts that as a result of such refusal, defendants became liable for $15,000.00 repatriation expenses. Count Three asserts that under the penalty wage statute, 46 U.S.C. § 10313, plaintiffs are entitled to penalty wages of two days pay for each day during which payment is delayed.

Underlying Counts One and Three is plaintiffs' claim for payment pursuant to the wage scale provided in the CCBA. Defendants have admittedly paid the repatriation expenses of the plaintiffs, and so plaintiffs no longer seek relief under Count Two. Count Two is therefore dismissed as moot.

Depositions were taken of the plaintiffs on February 13, 1990, at which several of them stated that Port Captain Katsimpiris, employed by the defendants, promised them a wage increase after they joined the vessel. (Defendants' Br. at 1). He allegedly responded that he would have to check with the owners before granting such an increase. (*Id.* at 1–2). The captain declares that he said no such thing. (Katsimpiris Aff., Defendants' Exh. F, ¶ 5). He says only that "[i]n a number of cases [seamen and I] had discussions and I told the men that they could be promoted after serving onboard if they were capable and did their job." (*Id.*) As indicated above, however, plaintiffs have made it clear that the basis of their claims is the CCBA, not any oral promise made by the captain.

Plaintiffs' counsel stipulated that each individual plaintiff would testify that he was fully paid under the POEA contract, that he never requested any cash advances beyond the amount set forth on his pay vouchers, that he is not a member of any Cypriot union, and that he did not make a request at any time for payment of wages under the CCBA. (*Id.* at 2).

Also on February 13, 1990, the parties stipulated and agreed to release the M/V Ippolytos from arrest. In exchange, the defendants placed $200,000.00 in an interest bearing account as security for plaintiffs' claims, established a discovery schedule, paid for the repatriation of each of the plaintiffs, paid all wages under the POEA to the plaintiffs through the date of the arrest of the vessel, and agreed to various protections for the plaintiffs.[1]

Defendants now make numerous motions in the alternative. In support of their motions, defendants provide a considerable amount of evidence. A representative Filipino employment contract is provided, as well as a copy of the stipulation by the plaintiffs' attorney and a copy of the bilateral agreement between Cyprus and The Philippines. Defendants also provide a copy of the CCBA and yellow certificate. Finally, *defendants include an affidavit from a Cypriot lawyer, a Filipino lawyer, and the Director of Shipping for Cyprus.*

Defendants first argue that Cyprus' and The Philippines' Special Agreement Regarding Merchant Shipping governs this dispute, and therefore this Court should decline to hear the case under the act of

---

1. The sum of $200,000.00 plus any accumulated interest remains under the joint control of counsel for the plaintiffs and defendants herein. It shall remain so until further order of this Court.

state doctrine. (Defendants' Br. at 2–5). The Agreement explicitly provides that a dispute of one country's shipowner with seamen from the other country shall be decided in the country of the seamen's nationality, where the employment contract was approved and signed. (*Id.* at 2–3).

Next, defendants argue plaintiffs do not have a claim under the wages statute, 46 U.S.C. § 10313 (formerly 46 U.S.C. § 596), because it requires that allegedly withheld wages must be true wages. In this case, defendants argue, plaintiffs were paid all that they were entitled to, and therefore their complaint is made in bad faith and should be dismissed. (*Id.* at 5–7). Furthermore, defendants assert that plaintiffs were not discharged in Newark, but that they left in "the hope that the penal wage statute would be applied to their wage complaints." (*Id.* at 6).

Third, defendants argue that this complaint should be dismissed on the basis of *forum non conveniens*, in favor of litigation in The Philippines. (*Id.* at 7–13). The plaintiffs are all Filipino, as are other key witnesses. (*Id.* at 10). There are simply no connections to the United States or to New Jersey sufficient to justify this Court's retention of this litigation. (*Id.* at 10–11). Specifically, defendants' agents, law experts and Philippine Government officials are all located in The Philippines, and are not subject to process in the United States. (*Id.* at 11). The defendants' port captain has agreed to be deposed and attend a trial in the Philippines, but not in the United States. He is not subject to process in the United States. (*Id.*) Finally, all of the relevant evidence, such as the contracts, are located in The Philippines. (*Id.*)

Defendants next argue that the law of Cyprus governs this dispute because that is the law of the flag of the ship. Under such law, the alleged statement of the port captain that there would be an increase in wages was insufficient to amend the employment contracts with the plaintiffs. (*Id.* at 14). Therefore, the complaint must be dismissed. (*Id.*) However, the same result would occur under the law of The Philippines, which could apply as stated in the POEA employment contracts. (*Id.*) In support of these arguments, defendants have provided the Court with reports from legal experts in The Philippines and Cyprus. Finally, defendants assert that even if United States labor law applied to the employment contracts at issue, the same result would occur because the alleged statements are too indefinite to be enforceable. (*Id.* at 15).

In their fifth point, defendants argue that they are entitled to summary judgment on the double wages issue because any withholding was not contrary to law, arbitrary, willful or unreasonable, as required for compensation under the penalty wage statute. (*Id.* at 16).

Defendants next argue that by depositing the $200,000.00 in an account, deemed by this Court to be as if deposited with the Court, they have tolled the running of penalty wages, in the event that they are subject to any such wages. (*Id.* at 19–20).

In the event that this Court finds that they are liable for an unlawful withholding of the plaintiffs' wages, defendants seek a declaratory order limiting the time duration of any penalty period. (*Id.* at 20). Specifically, they urge that no penalties accrue prior to February 10, 1990. (*Id.* at 23).

Defendants' ninth point is that because plaintiffs failed to make a demand for payment, no penalties may be assessed against them at all. (*Id.*) Specifically, plaintiffs' counsel stipulated that each plaintiff would testify that he did not make a request at any time for wages under the CCBA. (*Id.* at 24). In the alternative, if the Court found that the port captain did make an enforceable statement that higher wages would be paid, plaintiffs Sison, Ocumin, Cantal, Condeno, Sampiano, Alday and Bucaneg all testified that they never asked for more wages. Therefore, their claims for penalty wages should be dismissed for failure to make a demand for payment.

The plaintiffs have argued against each and every point that the defendants make. Plaintiffs provide the Court with a contra affidavit of a Filipino attorney, and an affidavit of a Cypriot Union signatory who states that the intent of Outlook and the

Cypriot Union was to have the higher wage scales paid to the Filipino seamen, *i.e.*, the plaintiffs. (Neocleous Aff., Plaintiffs' Exh. 8 at 21). Plaintiffs also submit copies of telexes and letters indicating that the Filipino crew was in trouble with the Filipino Government (POEA) and blacklisted by the industry as a result of contacting ITWF and filing this lawsuit. (*See* Plaintiffs' Exhs. 27–30). Both sides have provided additional information which this Court will refer to where relevant.

■ In the interests of efficiency, this Court will first consider those aspects of the motions which would dismiss the entire complaint. Specifically, the Court will first consider the act of state doctrine. Resolution of this motion includes this Court's use of the additional information submitted by the parties. Accordingly, this motion to dismiss will be treated as a motion for summary judgment. *See* Fed.R.Civ.P. 12(b).

## II. DISCUSSION

### A. *Standards Governing Summary Judgment*

Under Federal Rule of Civil Procedure 56(c), summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See also Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir.) (*en banc*), *cert. dismissed*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). In deciding a motion for summary judgment, the facts must be viewed in the light most favorable to the nonmoving party and any reasonable doubt as to the existence of a genuine issue of fact is to be resolved against the moving party. *Continental Insurance Co. v. Bodie*, 682 F.2d 436, 438 (3d Cir.1982). The moving party has the burden of establishing that there exists no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Supreme Court stated that in applying the criteria for granting summary judgment,

> the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict....

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). A fact is "material" only if it will affect the outcome of a lawsuit under the applicable law, and a dispute over a material fact is "genuine" if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. (*Id.*)

### B. *The Act of State Doctrine and Penalty Wage Statute*

■ The act of state doctrine is a consequence of domestic separation of powers, reflecting "the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder" the conduct of foreign affairs. *Kirkpatrick Inc. v. Environmental Tectonics Corp.*, 493 U.S. 400, 404, 110 S.Ct. 701, 704, 107 L.Ed.2d 816, 822 (1990) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423, 84 S.Ct. 923, 937, 11 L.Ed.2d 804 (1964)). The doctrine may be summarized as follows:

> Courts in the United States have the power, and ordinarily the obligation, to decide cases and controversies properly presented to them. The act of state doctrine does not establish an exception for cases and controversies that may embarrass foreign governments, but merely requires that, in the process of deciding, the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid.

(*Id.* at 409, 110 S.Ct. at 707, 107 L.Ed.2d at 825). The factual predicate for application of the act of state doctrine is an official act of a foreign sovereign. (*Id.* at 405, 110 S.Ct. at 704, 107 L.Ed.2d at 822).

> [In fact], [i]n every case in which we have held the act of state doctrine applicable, the relief sought or the defense would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory.

(*Id.*) Examples include defendant's detention of plaintiff within its borders in *Underhill v. Hernandez,* 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897); the government's seizure of property and questions of title thereto in *Oetjen v. Central Leather Co.,* 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918), and *Ricaud v. American Metal Co., Ltd.,* 246 U.S. 304, 38 S.Ct. 312, 62 L.Ed. 733 (1918); and a government's expropriation of goods in *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). *See Kirkpatrick, Inc.,* 493 U.S. at 404–07, 110 S.Ct. at 704–05, 107 L.Ed.2d at 822–23.

In juxtaposition to the act of state doctrine is the penalty wage statute, 46 U.S.C. § 10313. Subsection (g) provides for penalty wages of two days pay for each day of delay when a seaman proves wages were withheld without sufficient cause. Subsection (i) applies the statute "to a seaman on a foreign vessel when in a harbor of the United States. The courts are available to the seaman for the enforcement of this section." The latter section has nearly universally been interpreted to mean that if certain requirements are met, jurisdiction in the district courts is mandatory.

> Based on the unequivocal language in Section 10313, jurisdiction over a wage claim is mandatory if it is made in good faith. *Abraham v. Universal Glow, Inc.,* 681 F.2d 451, 453 (5th Cir.1982). Due to the potential for abuse in a rule requiring a court to assume jurisdiction over a seaman's suit whenever a wage claim is asserted, regardless of other considerations, the plaintiff must come forward with evidence of good faith

when contacts with the United States are minimal, and the defendant denies liability for the wage claim. *Id. citing Dorizos v. Lemos and Pateras, Ltd.,* 437 F.Supp. 120, 123 (S.D.Ala.1977); G. Gilmore & Black, at 479.

*Castillo v. Spiliada Maritime Corp.,* 732 F.Supp. 50 (E.D.La.1990); *see also Hernandez v. Naviera Mercante, C.A.,* 716 F.Supp. 939, 940 (E.D.La.1989) (same); *Velidor v. L/P/G Benghazi,* 653 F.2d 812, 819 (3d Cir.1982), *cert. dismissed,* 455 U.S. 929, 102 S.Ct. 1297, 71 L.Ed.2d 474 (1982) (same, under former §§ 596–597). In fact, many courts have determined that this mandatory jurisdiction cannot be defeated even by the doctrine of *forum non conveniens. See e.g. Abraham v. Universal Glow, Inc.,* 681 F.2d 451 (5th Cir.1982); *Dutta v. Clan Grahan,* 528 F.2d 1258 (4th Cir.1975); *Morewitz v. Andros Compania Maritima, S.A.,* 614 F.2d 379 (4th Cir. 1980).

There have been no cases cited to the Court, however, which address the relationship between the act of state doctrine and the penalty wage statute.

## C. Analysis

This case squarely places the issue before the Court whether the "mandatory" jurisdiction (if applicable) under the wage penalty statute is superseded by the act of state doctrine. In this case, this Court finds that the policies underlying the act of state doctrine are implicated to a greater degree than those implicated by the wage penalty statute. Accordingly, this Court will apply the act of state doctrine and direct the plaintiffs to litigate their claims in an appropriate forum in either Cyprus or The Philippines.

As previously stated, the act · of state doctrine reflects "the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder" the conduct of foreign affairs. *Kirkpatrick,* 493 U.S. at 404, 110 S.Ct. at 704, 107 L.Ed.2d at 822 (citing *Banco Nacional,* 376 U.S. at 423, 84 S.Ct. at 937). In the present case, the treaty between Cyprus and The Philippines,

providing for exclusive jurisdition in disputes between seamen and shipowners, would be rendered invalid if this Court assumes jurisdiction. The governments of each of these nations has made the affirmative decision as to dispute resolution, and this Court should not seek to nullify this decision. In fact, defendants have provided this Court with the affidavit of Jose Brillantes, former Labor Attache of the Government of The Philippines for the United States, presently Labor Attache in Canada. Mr. Brillantes states that "[t]he Government of the Philippines resents the implications in the plaintiffs' brief and affidavit that the POEA is anti-seaman.... [Furthermore], [i]t is the desire of the Government of the Republic of the Philippines that the Bilateral Agreement between the Republics of the Philippines and Cyprus, and Executive Order No. 247 and the POEA approved contracts of employment of the plaintiffs be honored in the United States and throughout the whole world." (Brillantes Aff., Defendants' Exh. K, ¶¶ 10, 12). Executive Order No. 247, signed by President Corazon Aquino on July 24, 1987, further reflects the policy of The Philippines that contracts with its seamen be adjudicated in The Philippines. *See* defendants' Exh. R. Similarly, the affidavit of Serghios S. Serghiou, Director of Merchant Shipping and the Registrar of Cyprus Ships, demonstrates to the Court that the Government of Cyprus is equally desirous that the treaty be given full force and effect. *See* defendants' Exh. E.[2]

In contrast to the above policy, the wage penalty statute has very different underpinnings.

The purpose of the Seaman's Wage Act is "to protect from overreaching a generally impecunious class", and to insure that foreigners "will not be turned ashore without funds," so that "they become a public charge on the harbor." ... The protective mantle of the Act is not confined to foreign seamen, however; it also guards the interests of American

seamen by equalizing the cost of operating United States and foreign flag vessels. American shipowners are thereby discouraged from placing their vessels under foreign flags, and foreign owners have no special incentive to avoid hiring United States citizens as crew members. *Velidor*, 653 F.2d at 818–19 (citations omitted).

In the present case, few of these policies would be served by retention of jurisdiction in this case. First, plaintiffs have all been returned to The Philippines at the expense of the defendants. Thus, they will not become public charges on the docks and streets of Newark. Second, although arguably members of "a generally impecunious class," plaintiffs have been paid to the full extent of their contracts, and this Court has every reason to believe that if they are entitled to more compensation, they will receive it through litigation in The Philippines or Cyprus. Assumption of jurisdiction may have the effect of helping to "equalize[ ] the cost of operating United States and foreign flag vessels," but not to the extent that plaintiffs claim. It is by no means clear to this Court that even if plaintiffs are entitled to the higher pay scale of the CCBA, that such pay scale is commensurate with traditional pay scales for United States seamen. Finally, this Court is loath to place protectionism before principles of international comity.

Plaintiffs' reliance on *Laker Airways v. Sabena, Belgian World Airlines*, 731 F.2d 909 (D.C.Cir.1984), and similar cases is misplaced. Laker was a British airline which filed an antitrust action in the United States District Court for the District of Columbia against several defendants, including domestic, British and other foreign airlines. Several of the foreign airlines filed suit in Great Britain, and obtained an injunction directing Laker to dismiss its action in the United States. Laker requested that the United States court issue a similar injunction, to prevent the remaining

---

**2.** The Court realizes that it is not bound by these declarations of the positions of Cyprus and The Philippines. However, they are strong evidence of not only the desires of these governments but also of the fact that, in the present matter, acts of state (the sovereigns themselves) are clearly involved.

defendants from duplicating this request and effectively foreclosing Laker from seeking its remedies. The court did so, and two of the enjoined defendants appealed, arguing that the United States injunction violated, *inter alia,* principles of international comity. 731 F.2d at 915.

The United States Court of Appeals for the District of Columbia Circuit affirmed the district court's injunction. In doing so, the court made several statements upon which plaintiffs herein rely. These statements amount to recognition that a United States court may, but is not required to, recognize an antisuit injunction issued by a foreign court. (*Id.* at 933–34). Jurisdiction is concurrent in transitory causes of action, and not even the full faith and credit clause compels recognition of an antisuit injunction. (*Id.* at 934). In rejecting defendants' arguments that Laker's nationality controls such that the United States courts must obey the British court's injunction, the court said that "[n]o foreign court can supersede the right and obligation of the United States courts to decide whether Congress has created a remedy for those injured by trade practices adversely affecting United States interests." (*Id.* at 935–36). Furthermore, an *"American court cannot refuse to enforce a law its political branches have already determined is desirable and necessary."* (*Id.* at 949) (emphasis in original).

*Laker* does not dictate the decision in the case at bar. The *Laker* court did not consider the act of state doctrine, nor would it have had reason to. *Laker* involved two directly competing statutes, each purporting to deprive courts of other countries' jurisdiction over antitrust matters. These statutes reflected directly competing policies of the respective legislatures concerning how businesses may operate, but exercise of jurisdiction, in particular, refusing to recognize a foreign court's antisuit injunction, merely affected the litigants'

rights. In contrast, the act of state doctrine arose to address the different situations in which jurisdiction in the United States would render an official act of a foreign sovereign, performed within its own territory, invalid as a result. The latter situation is implicated here because assumption of jurisdiction would render the Cypriot–Filipino treaty a nullity. The dispute herein does not put this Court in the position, as the *Laker* court was, in which "[n]o conceivable judicial disposition of this appeal would remove [an] underlying conflict." (*Id.* at 955).

Thus, this Court hereby declines to adjudicate Counts One and Three of plaintiffs' complaint, in favor of litigation in The Philippines or Cyprus.[3] The act of state doctrine directs this Court to respect and validate acts of foreign governments, in this case, the treaty between Cyprus and The Philippines.[4] Assumption of jurisdiction in this case would have the opposite effect.

As expressed at oral argument, however, if plaintiffs' rights under Philippine or Cypriot laws, contracts or treaties are patently ignored or abused in the foreign forum, the significance of their right of access to this Court under 46 U.S.C. § 10313 would escalate considerably. In essence, this Court is according comity to the nations of Cyprus and The Philippines in the expectation that the plaintiffs will receive a fair hearing, whatever its result may be. This Court retains jurisdiction *in rem,* over the $200,-000.00 fund substituted for the M/V Ippolytos. Although this Court will not assume the function of a court of appeal for any final disposition obtained abroad, it will at least entertain any future application to reopen this matter should any foreign decision or proceeding be so devoid of due process or fundamental fairness that it does not warrant recognition in this Court. Accordingly, the present action is stayed pursuant to the terms set forth in the Order which accompanies this Opinion.

---

3. This Court expresses no opinion as to which would be the proper jurisdiction for plaintiffs' claims, other than to note that the facts before it would appear to favor The Philippines.

4. The case at bar thus also differs from *Remington Rand v. Business Systems, Inc.,* 830 F.2d 1260, 1265 (3d Cir.1987), holding that the actions of a Dutch bankruptcy trustee were held not to "rise to the dignity of acts of a foreign sovereign" and thus were not "acts of state."

**936**

## ORDER

This matter having come before the Court on the motion of defendants for, *inter alia*, an order dismissing the complaint; and this Court having read and considered the papers submitted in support of and in opposition to said motions, and the Court having heard and considered the arguments of counsel; and good cause having been shown for the entry of the within Order, as set forth in this Court's Opinion of even date herewith,

It is on this 28th day of March, 1991, ORDERED that:

1. This Court determines, based upon the act of state doctrine, that this Court is not the proper forum to adjudicate plaintiffs' claims under Counts One and Three of the complaint, and therefore defendants' motion is granted to the extent that this matter is hereby stayed and administratively terminated;

2. Count Two of the complaint is dismissed as moot;

3. This Court retains limited jurisdiction to administer the $200,000.00 fund generated for purposes of releasing the M/V Ippolytos and to entertain applications, if any, to reopen this matter upon final disposition of plaintiffs' claims in the appropriate foreign forum;

4. The Court determines that this is a final judgment under 28 U.S.C. § 1291 and further determines that if it were found not to be final order it is nevertheless appealable under 28 U.S.C. § 1292(a)(3). Furthermore, the Court also determines that if this Order is not otherwise appealable, it "involves a controlling question of law as to which there is substantial ground for difference of opinion, and . . . an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).