611 So.2d 691 (1992)
Antonio PRADO
v.
SLOMAN NEPTUN SCHIFFAHRTS, A.G., Asiento Shipping Company, et al.
No. 91-CA-2450.
Court of Appeal of Louisiana, Fourth Circuit.
December 15, 1992.
*692 Waltzer & Bagneris, Bruce C. Waltzer, Paul S. Weidenfeld, New Orleans, for plaintiff-appellant.
D. Kirk Boswell, Charles F. Lozes, New Orleans, for defendant-appellee Asiento Shipping Co. N.V.
Before BYRNES, CIACCIO and LANDRIEU, JJ.
BYRNES, Judge.
The key issue in the case is whether the law of the United States should be applied to this maritime tort where plaintiff, Prado, is a citizen of the Republic of the Philippines; he joined the crew of the Epsilongas in the Philippines; the Epsilongas was a ship of Netherlands Antilles flag and registry and was the only vessel owned by defendant, Asiento, a corporation organized and existing under he laws of the Netherlands Antilles with its principal and only place of business in Willemstad, Curacao; the Epsilongas was a specialized vessel whose service was dedicated to making regular stops with only infrequent exceptions in Louisiana approximately every 12 days to pick up liquified gas which it would then transport to Cartagena, Columbia; plaintiff's employment contract was drafted by the Philippines Overseas Employment Administration (POEA), an agency of the Philippine government, and provided that all claims relative to the contract shall be exclusively resolved through the grievance procedure of POEA and the Philippine Court of Justice; that all rights and obligations of the parties to the contract shall be governed by the laws of the Republic of the Philippines; and, that POEA shall have original and exclusive jurisdiction over all disputes or controversies arising out of or by virtue of the employment contract; at the time of the injury on May 2, 1987, the Epsilongas was plying the international waters of the Yucatan Channel en route to Louisiana, and upon the recommendation of the United States Coast Guard the Epsilongas proceeded to Key West, Florida to obtain medical assistance for plaintiff; he departed the Epsilongas at Key West, he was treated in Miami, and he was repatriated to the Philippines on August 17.
Plaintiff filed suit in the Civil District Court for the Parish of Orleans under the Jones Act, 46 U.S.C.A.App. 688, and the general maritime laws of the United States against defendant, Asiento Shipping Co. N.V., his employer and the owner of the ship on which he was injured. Sloman Neptun Schiffahrts A.G., Norqulf-Uniqas, Inc., and Hanseatic Shipping Company, originally named as defendants, were dismissed by plaintiff as of May 20, 1988. Defendant filed exceptions to the venue, exceptions of no right and no cause of action, and a motion for summary judgment. The trial judge granted the exception of no cause of action. He did not specifically rule on the exception of no *693 right of action or the motion for summary judgment.
Plaintiff previously appealed that decision to this court and we affirmed. Prado v. Sloman Neptun Schiffahrts-A.G., 558 So.2d 712 (La.App. 4 Cir.1990). In those proceedings we ruled that the exception of no cause of action had been improperly granted. At the same time, we took note of defendant's motion for summary judgment which we felt was ripe for adjudication. In the interest of judicial economy, therefore, on our own initiative, we granted summary judgment in favor of the defendant. The plaintiff, Prado, applied to the Supreme Court for writs, which summarily reversed our decision and remanded the case to the district court for consideration of the pending motion for summary judgment. Prado v. Sloman Neptun-Schiffahrts-A.G., 565 So.2d 930 (La.1990).
On remand the trial court granted defendant's motion for summary judgment without written reasons, and it is from that decision that the plaintiff now appeals to this court.

I. JURISDICTION
We find that the frequency and regularity of contacts by the Epsilongas with Louisiana (approximately every 12 days with few exceptions) is sufficient to confer jurisdiction upon this court even though the defendant, Asiento, did not maintain an office in this state as was the case in de Reyes v. Marine Management and Consulting, 586 So.2d 103 (La.1991). "The contacts here are far more than those minimal contacts which suffice for the exercise of long arm jurisdiction over the owner, and which might arise simply from an occasional call at American ports." Mattes v. National Hellenic Am. Line, S.A., 427 F.Supp. 619, 628 (1977). Neither party has raised any objections to our jurisdiction. In fact, counsel for Asiento specifically acknowledged jurisdiction in oral argument.

II. CHOICE OF LAW AND FORUM NON CONVENIENS
The relevant considerations for Jones Act choice of law determinations have been set forth in Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), and Hellenic Lines, Limited v. Rhoditis, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970). Lauritzen listed seven factors to be considered in deciding whether the Jones Act applied: (1) place of wrongful act; (2) law of the flag; (3) allegiance or domicile of the injured party; (4) allegiance of the shipowner; (5) place of the contract; (6) inaccessibility of foreign forum; and (7) law of the forum. 345 U.S. at 583-92, 73 S.Ct. at 928-33. Rhoditis expanded on the Lauritzen test by stating that the seven-factor list "was not intended as exhaustive," and that the test was "not a mechanical one." 398 U.S. at 308-09, 90 S.Ct. at 1733-34. In holding the Jones Act applicable, the Rhoditis court noted that the shipowner's "base of operations" should also be considered. 398 U.S. at 309, 90 S.Ct. at 1734.
The Lauritzen-Rhoditis factors are intended to answer the choice of law question, i.e., should the court apply the law of the United States or the law of another nation. Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953); Hellenic Line, Ltd. v. Rhoditis, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970); Romero v. International Terminal Operating Co., 358 U.S. 354, 382, 79 S.Ct. 468, 485, 3 L.Ed.2d 368 (1959).
"We agree with the Fifth, Tenth and Eleventh Circuits that a choice of law determination must be made before a circuit court dismisses a case under forum non conveniens." Pereira v. Utah Transport, Inc., 764 F.2d 686, 688 (9 Cir.1985); See also: Fisher v. Agios Nicolaos V, 628 F.2d 308, 314 (5 Cir.1980). "First, the court must decide, under choice of law principles, whether the law of the United States should be applied. If United States law applies, the case should not be dismissed for forum non conveniens. If the court determines that United States law does not apply, it then examines the traditional considerations of forum non conveniens to determine whether the court should exercise its discretion and decline to assert *694 jurisdiction over the case." Szumlicz v. Norwegian America Line, Inc., 698 F.2d 1192, 1195 (11 Cir.1983). (Emphasis added).
We agree with the reasoning and cases referred to in Szumlicz, supra. However, in Louisiana "... the doctrine of forum non conveniens is specifically made unavailable in a Jones Act or maritime law case." Miller v. American Dredging Co., 595 So.2d 615, 617 (La.1992); LSA-C.C.P. art. 123. Writs applied for, 60 U.S.L.W. 3844 (May 1992).
Therefore, as we have jurisdiction, if we determine that foreign law applies, we must either remand this case to the trial court to apply it or transfer it to a foreign forum on a basis as other than forum non-conveniens.

III. BASE OF OPERATIONS
Plaintiff concedes in his brief that he can meet none of the seven Lauritzen criteria. Therefore, this court need only consider whether there was a genuine issue of material fact concerning Asiento's "base of operations". If we determine that there is a genuine issue of material fact about the existence of a base of operations, we must then decide whether that factor in the absence of all seven Lauritzen criteria is sufficient in itself to warrant the application of United States law.
Determining the base of operations of a shipping enterprise is a question of fact. Dalla v. Atlas Maritime Co., 771 F.2d 1277, 1278 (9 Cir.1985); Szumlicz v. Norwegian American Line, Inc., 698 F.2d 1192, 1196 (11 Cir.1983); Fisher v. Agios Nicoloas V., 628 F.2d 308 (5 Cir.1980). Moreover, we find that it is a material fact. However, we do not find that Prado has succeeded in raising any genuine issues regarding that fact.
First we will consider all four cases cited by Prado to support his base of operations argument:
1. In Hellenic Lines Limited v. Rhoditis, supra, which established the "base of operations" test, the shipowner, Hellenic Lines Ltd., although nominally a Greek corporation, had its largest office in New York and another in New Orleans. Asiento Shipping has no offices in the United States. In Rhoditis, 95% of the stock in Hellenic Lines was owned by a permanent resident of the United States (although he maintained Greek citizenship) who lived in Connecticut and managed the corporation out of New York. Asiento has no United States ownership.
Rhoditis is so closely identified with the "base of operations" criterion which it established that it is easy to overlook another significant factor in that casethe injury occurred in the United States! Prado, on the other hand was injured in international waters.
2. In Fisher v. Agios Nicholas V, 628 F.2d 308 (5 Cir.1980), the trial court made a factual finding that the shipowner had a base of operations in the United States which finding was affirmed by the appellate court only on the basis that it "... should not be disturbed on review unless clearly erroneous." 628 F.2d at 318. However, the court in Fisher made a number of observations which distinguish it from the instant case:
"The district court held ... that it was... appropriate to apply United States law to the consequences of this accident in an American port, to which a seaman had flown to join the vessel, and in which port he had worked during his entire service on the vessel prior to the fatal accident there .... [P]rior to the accident, the vessel's entire service under its present ownership, and its entire revenues therefore to be earned, arose from a base of operations in the United States." 628 F.2d at 317. (Emphasis added).
Fisher is unique in that the vessel in question was on its maiden voyage. Therefore, the court placed great emphasis on the fact that in that brief time its only connection was with the United States where the decedent had flown to join the ship and where the injury actually occurred. These facts provide no support for Prado's position.
*695 3. Dalla v. Atlas Maritime Co., 771 F.2d 1277 (9 Cir.1985), was a per curiam opinion in which the court again merely applied a "not clearly erroneous" standard to the lower court's finding that the defendant had a base of operations in the United States. The appellate decision contained few details describing the factors considered by the trial judge in reaching that determination. We know little more than that "... the judge applied common sense and concluded that the vessel's owners are United States nationals. He also concluded that the vessel had substantial and continuing contacts with this country and virtually none with Liberia." 771 F.2d at 1278. However, the court did note that the injury occurred in the United States.
4. In Szumlicz v. Norwegian American Lines, Inc., 698 F.2d 1192 (Cir.1983), the court found that the defendant, Norwegian America Line Inc., had a base of operations in the United States. However, the defendant had a far greater presence in the United States than does Asiento. It maintained offices in Fort Lauderdale, Florida, and in New York, New York. Norwegian American Lines advertised and operated two, three and four week Caribbean cruises, commencing and terminating in Fort Lauderdale. Moreover, the ship in question was substantially financed by American concerns. Special rates were offered to passengers flying in from various points in the Continental United States. The injury occurred while the vessel was traveling between United States ports.
The following patterns emerge from these cases cited by Prado:
1. Although these cases ostensibly downplay the significance of the "place of injury", we are not convinced that it was a mere coincidence that, in Rhoditis, Fisher and Dalla, the injury occurred in the United States, and, in Szumlicz the injury occurred while the ship was traveling between United States ports.
2. In Rhoditis, Szumlicz, and Dalla, the court found that the defendants had a permanent, physical presence in the United States in the form of offices and/or ownership in addition to other substantial contacts; and in Fisher, which is really an anomaly, the court found that all of the defendant's operations were in the United States up to the time of the injury because Beaumont, Texas was the first and only business stop the ship had made on its maiden voyage at the time the injury occurred.
None of these cases provide support for Prado's claim. A survey of other relevant cases is even more damaging to Prado's position.
In Matute v. Procoast Nav. Ltd., 928 F.2d 627 (3 Cir.1991), the frequency and regularity of voyages to the United States exceeded those of Prado's ship by a margin of almost 2 to 1! The plaintiff, a Honduran citizen, was a crew-member of a vessel registered in the Republic of Cyprus. The ship was owned by a corporation whose officers, director, and stockholders were citizens and residents of West Germany. The injury occurred outside the United States. The vessel was on regular weekly lines service between Bermuda and New Jersey. By comparison, the Epsilongas came to Louisiana only approximately every 12 days. In Matute the owner had an agent in the United States acting on its behalf as does Asiento. Although the Matute court failed to elaborate on the nature of the activities conducted by the ship when in port on a weekly basis in New Jersey, it is reasonable to assume that they were qualitatively equivalent to and quantitatively greater than those of the Epsilongas in the instant case. Yet the court held that the plaintiff failed to meet the Lauritzen-Rhodites tests.
In Pereira v. Utah Transport, Inc., 764 F.2d 686 (9 Cir.1985), the vessel flew the Liberian flag and was owned by Liberian corporations (referred to as Utah) whose offices were located in San Francisco, and from which offices the operations of the vessel were conducted. The plaintiff, who was injured off the coast of Thailand, was a Spanish national, and the employment contract provided that the law of the flag was to apply. The court found that a foreign forum was accessible to plaintiffs, but conditioned dismissal on the ability of plaintiff *696 to return to the United States forum if the foreign court declined jurisdiction. The vessel rarely visited American ports, although other vessels owned by the same companies frequently did:
"Pereira's `base of operations' argument confronts two significant factors supporting the district court's conclusion that Liberian law applies. First, the law of the flag is the `most venerable and universal rule of maritime law." Lauritzen, 345 U.S. at 584, 73 S.Ct. at 929. THE LAKE MENDOCINO flies the Liberian Flag. Second, the contract provided that the law of the flag govern all disputes. These considerations outweigh the fact that Utah is based in San Francisco, especially in light of the fact that THE LAKE MENDOCINO rarely called at an American port. (Emphasis added) 764 F.2d at 689.
In Quintero v. Klaveness Ship Lines, 914 F.2d 717 (5 Cir.1990), cert. denied, ___ U.S. ___, 111 S.Ct. 1322, 113 L.Ed.2d 255 (1991), a Filipino sailor was injured while unloading a Liberian-registered and flagged Norwegian owned ship docked in the Port of New Orleans. The employment contract was signed in the Philippines and was developed by the defendant in cooperation with the Philippine and Norwegian seamen's unions. The contract contains a choice-of-law clause providing that Philippine law governs the agreement. It was approved by a Philippine government agency (presumably the same agency that approved Prado's contract). Plaintiff would have access to a Philippine forum. The court said of the vessel: "The record indicates that she operated worldwide; thus, the fact that she called at United States ports, without more, does not support a finding of a United States base of operations." 914 F.2d at 723. The court dismissed the case, holding that the law of the Philippines governed the controversy and that the plaintiff should look to a forum in that country for relief.
Asiento is not a foreign shell created by American interests to avoid the requirements of American law. Kukias v. Chandris Lines, Inc., 839 F.2d 860, 862 (1 Cir. 1988).
The place of hospitalization is not a factor. Kukias v. Chandris Lines, Inc., 839 F.2d at 863.
Kukias is also helpful because the court laid out the facts with greater than usual detail and clarity:
"Kukias, a resident and citizen of Greece, was employed aboard the Victoria, a vessel of Panamanian registry, owned by defendant-appellee Phaedon Navegacion, S.A. (Phaedon), a Panamanian corporation, and managed and operated by defendant-appellee Chandris, S.A. (Chandris), a Liberian corporation. The known shareholders of both corporations are Greek domiciliaries and neither corporation maintains any offices or facilities in the United States. An independent entity, Chandris, Inc., incorporated in Delaware, serve as general passenger agent for Chandris, S.A. in the United States. Kukias does not contest the district court's dismissal as to Chandris, Inc. (Emphasis added)
On April 16, 1984, the Victoria, during its Caribbean cruising season, was on a voyage from San Juan, Puerto Rico to St. Thomas, Virgin Islands. On that date, Kukias was injured when he fell down a stairway. He received treatment aboard the vessel, and was later hospitalized in St. Thomas. [839 F.2d at 861].
* * * * * *
Kukias contends that "[t]he facts overwhelmingly evidence `substantial contact' with the United States by Chandris and the Victoria." Kukias stresses that, for a major portion of the year, the Victoria embarks on weekly cruises from Puerto Rico; that substantial revenue from American sources is generated from the operation of the Victoria and is collected by a domestic corporation, Chandris, Inc.; that the vessel is supplied with food and provisions in an American port; and that large sums are spent in advertising the Victoria in the United States. On the basis of these facts, Kukias would have the court decide that the base of operations for Chandris and the Victoria is in the *697 United States, and, therefore he has stated a cause of action under the Jones Act. The court, however, does not agree. (Emphasis added).
As noted previously, the defendants in this case are foreign corporations controlled by Greek domiciliaries. Defendants maintain no offices in the United States, and management decisions are not made in this country. Furthermore, for portions of the year, the Victoria cruises exclusively in European port. While the vessel generates revenue from United States sources, and regularly travels to American ports, the management and ownership of the Victoria rest exclusively in the hands of Greeks who do not conduct their activities within the United States." [839 F.2d at 864]
* * * * * *

A different result clearly is not warranted in this case simply because at the time of the injury, Kukias was on board a vessel which may have been traveling in United States waters. [Emphasis added] 839 F.2d at 864 and 865.
Sigalas v. Lido Maritime, Inc., 776 F.2d 1512 (11 Cir.1985), involved a wrongful death action for a Greek citizen and domiciliary, who was crew member of the luxury cruise ship, the Royal Odyssey, a Greek flag vessel. It was owned by Lido Maritime, a Liberian corporation with principal offices in Greece and with 80% stock ownership by Greek nationals and domiciliaries. It was managed by Royal Cruise Line Ltd. (Piraeus), a Liberian corporation with its principal place of business also in Greece. In excess of 80% of Royal Cruise (Piraeus) shares are held by Greek nationals and domiciliaries. All corporate officers of both Lido and Royal Cruise (Piraeus) are Greek nationals and domiciliaries. During the winter it called in the Caribbean and in the American ports of Miami, St. Thomas, and San Juan. In all seasons, over 90% of Royal Odyssey ticket sales were to American nationals. The death complained of took place in Africa on a voyage to Miami. In spite of very substantial United States contacts, the court refused to adjudicate the claim on grounds that are very relevant to the instant case:
Royal Cruise Lines (USA) Inc., an American corporation wholly owned by an American who is also a stockholder in Lido, maintained offices in San Francisco as Lido's main American ticket outlet. Lido pays Royal Cruise (USA) a commission on ticket sales, bears all operating expenses and pays the salaries, rent and advertising for the American concern. Lido and royal Cruise Lines (Piraeus) exercise exclusive control over, inter alia, the itinerary, personnel, maintenance, insurance, supplies, provisions, financing, port agents, and port itinerary of the ROYAL ODYSSEY. The bulk of the witnesses, and almost all those who are as yet undeposed, are Greek nationals and domiciliaries. Mr. Sigalas was hired as a Third Assistant Engineer and signed a Greek contract containing a choice of forum law and stipulated that contractual disputes were to be governed by Greek law in Greek courts. 776 F.2d at 1514.
* * * * * *
... [T]he bulk of Lido's revenue comes from American pocketbooks. That alone is not enough to justify application of American law. Were this an American passenger the posture of this case might be quite different, but such a case is not presented today ... 776 F.2d at 1518. (Emphasis added).
* * * * * *

"It is no longer sufficient to retain jurisdiction simply because the remedy available in an alternative forum is substantively less generous." 776 F.2d at 1519. (Emphasis added).
* * * * * *

In sum, Mrs. Sigalas represents the archetypal foreign plaintiff bringing her foreign tort claim to American courts to secure relief more generous than she would get under the law of her homeland. Greece has strong contacts with this case. America has virtually none. 776 F.2d at 1520. (Emphasis added).
*698 In Mattes v. National Hellenic Am. Line, S.A., 427 F.Supp. 619, 623 (D.C.N.Y. 1977), the plaintiff was a Greek citizen, hired in Greece, under Greek articles of employment (which required resort exclusively to Greek courts) as a crew member of the S.S. Amerikanis, a Greek flag ship. He was injured on the high seas on the way to New York. The court found that the Greek forum was accessible and the owner agreed to post a bond to guarantee its appearance in a Greek court should Mattes sue there. In determining that United States law should apply, the court detailed defendants' substantial presence and varied contacts with the United States far exceeding those of Asiento in the instant case:
The Moncada [v. Lemuria Shipping Corp., 491 F.2d 470 (2d Cir.1974)] court indicated that (1) the base of operations; (2) the location of the managing or chartering agents; (3) the nationality of the corporate officers; and (4) the percentage of the vessel's voyages beginning or ending in American port, were also significant. The Antypas [v. Cia. Maritima San Basilio, 541 F.2d 307 (2d Cir. 1976)] court explanded this list, to indicate that (5) the extent to which advertising or other commercial transactions suggest an identity of interests between foreign owners and American agents; and (6) the place where the vessel's earnings were collected, and its expenses paid, must also be considered in deciding whether the sum of the American contacts is substantial. 427 F.Supp. at 623.
* * * * * *
During the time in question the AMERIKANIS was a passenger vessel, most of whose voyages either originated or terminated in the United States. 427 F.Supp. at 624.
* * * * * *
Although most crew members of the AMERIKANIS in the summer of 1974 were Greek, Bangladesh or other foreign nationalities, two Americans served as crew and numerous crew members signed on to the vessel at various times in American ports.... Eighty-five percent of its passengers were American citizens ... and the vessel therefore derived the better part of its substantial revenues from these American customers. 427 F.Supp. at 624. (Emphasis added).
* * * * * *
Whether these factors alone create "substantial contacts" sufficient to justify application of the Jones Act need not be determined, since the vessel and its corporate owner had numerous other ongoing American Business connections. Cf. Brillis v. Chandris (U.S.A.) Inc., supra, 215 F.Supp. 520. The management and operation of the vessel, though divided among many countries and many corporations whose precise interrelationship cannot be determined on the present skimpy record, were centered in part in New York. 427 F.Supp. at 624 [Emphasis added]
* * * * * *

[A]t least two American corporations played a significant role in the management of the vessel's affairs. 427 F.Supp. at 624. (Emphasis added).
* * * * * *
Costa collects all passenger revenues for the AMERIKANIS, maintains a bank account for the ship at First National Citibank, and pays at least some of the ship's expenses from this account. It has substantial discretion over booking procedures, passenger reservations, accounting methods for keeping track of revenues, and over the preparation of advertising materials. Under the agreement, all substantial advertising and promotional materials, though prepared by Costs, must be submitted to Chandris (Eng.) Ltd. (not a signatory to the agreement) for its approval as an agent for CALSA. 427 F.Supp. at 625. (Emphasis added).
* * * * * *
Extensive advertising, prepared by Costa Lines, appeared in this country for cruises on the S.S. Amerikanis in 1974-75. 427 F.Supp. at 625.
* * * * * *

*699 Defendants' response to interrogatories shows that the officers of the three defendants in this case included three American citizens. [Emphasis added] 427 F.Supp. at 626.
* * * * * *
Guided by this statement, we conclude that: the AMERIKANIS' business probably centered in the United States in 1974; substantial aspects of its operations, management and marketing are directed by American corporations: [Emphasis added] 427 F.Supp. at 626.
* * * * * *
In spite of all of these considerable contacts, the court in Mattes still felt they were barely sufficient to warrant the application of United States law. "... [T]he issue is close." 427 F.Supp. at 627. Asiento's contacts are in no way comparable.
In Tarsenko v. Cardigan Shipping Co., Ltd., 671 F.Supp. 997 (S.D.N.Y.1987), the plaintiff, although a Norwegian national, was a resident of the United States, domiciled in Miami, Florida. He signed on in the United States as a member of the crew of the M/V Norse Falcon which called numerous times at New York and other United States ports. The court held that these contacts were not sufficient to warrant jurisdiction where:
(1) The injury did not occur in United States waters.
(2) It was a Bahamian flag vessel registered in the Bahamas.
(3) The owner is a British company with offices in London, and is a wholly-owned subsidiary of a Norwegian corporation whose offices are in Olso, Norway.
(4) The owner had no office or general agent in the United States.
(5) The nominal and beneficial owners of Cardigan Shipping Co., Ltd., and its affiliates and subsidiaries, are all foreign nationals and residents.
(6) The sole bank account maintained was in New York for the purpose of paying minor accounts, such as became due as a result of calling at American ports.
(7) The court stated that: "The existence of a clause in the employment agreement specifying Norwegian law to govern the rights and obligations of the plaintiff expresses the intent of the parties, for such a forum clause is generally binding. The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972)."
Prado's claim does not meet the standards of any of the cases discussed above.

IV. SUMMARY JUDGMENT
A motion for summary judgment may be granted if the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966; Urbeso v. Bryan, 583 So.2d 114, 116 (La.App. 4th Cir.1991); Woods v. ABC Ins. Co., 580 So.2d 480, 481 (La.App. 4th Cir.1991). The burden of showing that there is no genuine issue of material facts and that the mover is entitled to judgment as a matter of law is upon the mover, and all doubt must be resolved against the mover and in favor of a trial on the merits. Chaisson v. Domingue, 372 So.2d 1225, 1227 (La.1979); Woods v. ABC Ins. Co., 580 So.2d at 481.
A fact is material if it is essential to plaintiff's cause of action under the applicable theory of recovery and without which plaintiff could not prevail. Generally, material facts are those that potentially insure or preclude recovery, affect the litigant's ultimate success, or determine the outcome of a legal dispute. Schroeder v. Board of Sup'rs of Louisiana State University, 577 So.2d 1074, 1078 (La.App. 1 Cir.), reversed on other grounds, 591 So.2d 342 (La.1991); Eads Operating Co. Inc. v. Thompson, 537 So.2d 1187, 1194 (La.App. 1st Cir.1989). Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can only be seen in the light of the substantive law applicable to the case. Schroeder v. Board of Sup'rs of Louisiana State University, 577 So.2d at 1079; Sun Belt Constructors, a Division of MCC Constructors, Inc. v. T *700 & R Dragline Service, Inc., 527 So.2d 350, 352 (La.App. 5 Cir.1988).
In addition to the previously mentioned frequency of the voyages by the Epsilongas to Louisiana, plaintiff makes several arguments concerning the nature of Asiento's contacts with the United States which we choose to quote, not only because we are impressed with their resourcefulness, but because we wish to make it abundantly clear that these matters were carefully considered in arriving at our decision:
These records show the intricate public and private web which supports this enterprise on a systematic and regular basis such as government inspections of the vessels, surveys, numerous U.S. Treasury and Customs Department documents, and many of the private services necessary for Asiento to support its shipping business.
Though, the records do not show a complete picture; it is clear that Asiento, through its vessel, takes unrestricted advantage of the benefits, services, and protections available to it in Louisiana. It is equally clear that in any or all of these many dealings with Louisiana businesses and state or federal governmental agencies, Asiento had the same right of access to the state courts of Louisiana or the district courts of these United States as any Louisiana company would have had. And once in court, of course, it is the laws of these United States that would have to be applied.
We accept for purposes of argument the veracity of all of these assertions. However, all of these "surveys", "inspections", "documents" or "services" referred to in plaintiff's brief appear to be nothing more than what would be ordinary and incidental to any ship doing business at a Louisiana port.[1]
The welter of bureaucratic paper work largely forced on vessels by governmental agencies which call at U.S. ports has never been the type of contact contemplated by the Supreme Court in Lauritzen or Rhoditis. Neither would be such acts as repairs, medical services, provisioning, etc., which are incidental to any call at a foreign port.
Nor should Asiento's access to our state and federal courts in connection with its "many dealings with Louisiana business" be persuasive. Were a Louisiana business involved, of course, the result might be different, just as the result might be different if Mr. Prado were a United States citizen. See Sigalas v. Lido Maritime, Inc., 776 F.2d 1512, 1518 (11th Cir.1985). It is reasonable to assume that the "many dealings with Louisiana businesses" referred to in Prado's brief are for goods and services furnished and rendered in Louisiana regarding which Louisiana state and federal courts would naturally have jurisdiction. Naturally, if Asiento complained about goods or services furnished to it in Louisiana by a Louisiana business, it is certain that said Louisiana business would have no valid objection to having United States law applied by a Louisiana court. The fact that this court could validly apply United States or Louisiana law to a hypothetical Louisiana cause of action to which Asiento might be a party in another matter, does not mean that there are sufficient contacts to justify the application of United States law to Mr. Prado's claim.
"... [S]ummary judgment is generally improper where the party opposing the motion has not had the opportunity to discover potentially controlling evidence." Gazis v. John S. Latsis, (USA) Inc., 729 F.Supp. 979, 983 (S.D.N.Y.1990). When the Prado case came before this court on appeal the first time, we found that he had had adequate opportunity to make sufficient discovery to allow us to grant summary judgment. *701 This is even truer now that plaintiff was allowed the opportunity to make additional discovery on remand prior to the rendering by the trial court of the summary judgment which is the subject of this second appeal. The deposition of Daryl Richard added to Prado's case only quantitatively, not qualitatively.
Prado has not shown, nor does he contend that he will show upon further discovery or at a trial on the merits that there was any American ownership of Asiento or the Epsilongas; that there were any offices, directors or employees of Asiento who were United States citizens or residents; that Asiento owned, leased, or operated any officer or property in the United States; that Asiento was ever authorized or licensed to do business in Louisiana; that any seamen or passengers aboard the Epsilongas were United States citizens or residents; nor that marketing and policy decisions were made in the United States.
We hold that Asiento had not sufficient contacts with the United States to constitute a base of operations, nor to warrant the application of United States law; and we hold that Prado failed to raise any genuine issues of fact concerning these matters.

V. PRADO'S CONTRACT OF EMPLOYMENT WAS NOT A CONTRACT OF ADHESION
Plaintiff argues that choice of law clauses such as the one in his employment contract calling for the application of the law of the Philippines "have long been ignored by the courts of the United States" citing Rhoditis, Fisher, and Szumlicz, supra. Plaintiff also cites M/S Bremen v. Zapata, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), which is the seminal case providing the foundation for the prevailing attitudes towards maritime contractual forum selection clauses and theories of unequal bargaining power, i.e., contracts of adhesion. In the Bremen case the Supreme Court actually upheld the forum selection clause in particular, and spoke strongly in their favor in general. The Bremen court said that the weight of current legal authority now favors the more enlightened view that:
... such clauses are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be "unreasonable" under the circumstances. [407 U.S. at 9, 92 S.Ct. at 1913]
* * * * * *
The argument that such clauses are improper because they tend to oust a court of jurisdiction is hardly more than a vestigial legal fiction. It appears to rest at core on historical judicial resistance to any attempt to reduce the power and business of a particular court and has little place in an era when all courts are overloaded and when businesses once essentially local now operate in world markets. It reflects something of a provincial attitude regarding the fairness of other tribunals. [407 U.S. at 11, 92 S.Ct. at 1914] [Emphasis added]
* * * * * *
[I]t seems reasonably clear that the District Court and the Court of Appeals placed the burden on Unterweser to show that London would be a more convenient forum than Tampa, although the contract expressly resolved that issue. The correct approach would have been to enforce the forum clause specifically unless Zapata could clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching. [407 U.S. at 15, 92 S.Ct. at 1916] (Emphasis added).
* * * * * *

We are not here dealing with an agreement between two Americans to resolve their essentially local disputes in a remote alien forum. In such a case, the serious inconvenience of the contractual forum to one or both of the parties might carry greater weight in determining the reasonableness of the forum clause. The remoteness of the forum might suggest that the agreement was an adhesive one, or that the parties did not have the particular controversy in mind when they made their agreement; yet even there *702 the party claiming should bear a heavy burden of proof. [407 U.S. at 16, 92 S.Ct. at 1917]
* * * * * *
... [I]t should be incumbent on the party seeking to escape his contract to show that the trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court. Absent that, there is no basis for concluding that it would be unfair, unjust, or unreasonable to hold that party to his bargain. [407 U.S. at 16, 92 S.Ct. at 1917]
In Rhoditis, the injury occurred in the United States and the court felt that overriding all other considerations was the fact that although the shipowner was nominally a Greek corporation, it was actually owned and operated out of offices in the United States by a permanent resident of the United States. There is also no indication that the contract of employment entered into by the Greek seaman in the Rhoditis case which specified a Greek legal forum for the handling of claims was one in which the Greek government expressed any national policy interest or had intervened in any way to dictate or supervise the terms, conditions, or manner of execution and enforcement.
The same could be said of the Fisher case, supra. It also involved a Greek seaman and a Greek employment contract but this was outweighed by the fact that the injury occurred in the United States and the court found that "the vessel had a substantial base of operations in the United States and its owners derived substantial revenues from United States trade." 628 F.2d at 317. In a footnote the court said that: "Probably due to the disparity in bargaining power between the seaman and his employer, American courts have generally accorded little determinative weight to such contractual choice of law provisions. A. Gilmore and C. Black, the Law of Admiralty, 476 (2nd ed. 1975)." However, there is no indication that the seamen's government had in any way intervened on his behalf in the formation of his employment contract.
Szumlicz is even less applicable. In that case a Polish national signed an employment contract specifying that "rights and duties under this contract of service shall be governed by Norwegian Seaman's Regulations..."
The policy considerations regarding Prado's employment contract are entirely different. Prado was a Philippine national hired through the Philippine Overseas Employment Administration ("POEA"), an agency of the Philippines Ministry of Labor and Employment. This kind of arrangement was carefully considered in Cruz v. Chesapeake Shipping, Inc., 932 F.2d 218, 221 (3d Cir.1991), where the court stated that:
"Under Philippine law no foreign employer may hire Philippine workers for overseas employment except through the POEA.
The Philippine government established the POEA to promote and develop overseas employment opportunities and to afford protection to Philippine workers and their families. The POEA has promulgated extensive rules and regulations controlling overseas employment to accomplish these objectives. It registers seaman seeking jobs, prescribes standard employment contracts for them, approves their wages, and requires that 80% of their earnings be sent home. The POEA regulates advertisement and placement, contract processing and travel documentation, the filing of grievances, and provides worker assistance and Welfare services."
See Quintero v. Klaveness Ship Lines, 914 F.2d 717 (5th Cir.1990), cert. denied, ___ U.S. ___, 111 S.Ct. 1322, 113 L.Ed.2d 255 (1991). See also Tismo v. M/V Ippolytos, 776 F.Supp. 928, 929 and 934 (D.N.J.1981) which dealt with POEA forum selection provisions. However, the argument in favor of a Philippines forum in Tismo was strengthened because of the existence a specific treaty which existed between the governments of the Philippines and Cyprus.
Damigos v. Flanders Compania Naviera, S.A.-Panama, 716 F.Supp. 104 *703 (S.D.N.Y.1989), involved a Greek flag vessel, Greek seaman, etc., and a claim arising in foreign waters. The court followed Bremen and gave great weight to the selection of a Greek forum in the Greek seaman's contract. At 716 F.Supp. at 109, the court stated:
"District courts should not consider differences in remedy between forums unless "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all."
See also Sigalas v. Lido Maritime, Inc., 776 F.2d 1512, 1519, 1520 (11th Cir.1985); Tarsenko v. Cardigan Shipping Co., Ltd., 671 F.Supp. 997 (S.D.N.Y.1987).
Applying Bremen standards and the other cases cited herein to Prado's POEA contract we make the following observations:
Prado's employment contract was in the form and used the language required by his own government in the interests of its own citizens, including the choice of law and forum selection clauses. There can be no basis for Prado to complain that Asiento took advantage of him in negotiating the language of the contract. Prado cannot complain that the Philippines is a "remote alien forum." Bremen, 407 U.S. at 16, 92 S.Ct. at 1917. We cannot be persuaded that whatever forum Prado's claim would be referred to in the Philippines would be less favorably inclined towards him than towards a non-resident alien entity such as Asiento. When the Bremen court used the terms "unjust and unreasonable" it was not referring to Prado's desire to choose the forum of maximum recovery. Asiento has not been accused of "fraud or overreaching." Bremen, 407 U.S. at 15, 92 S.Ct. at 1916. There is nothing to suggest "that the agreement was an adhesive one." Bremen, 407 U.S. at 16, 92 S.Ct. at 1917. We would be presumptuous to assume that the procedures for the handling of this case established by the friendly foreign government of the Philippines in pursuit of the welfare of its citizens does not provide a reasonable alternative to those available in this Court.
It is easy to imagine a number of valid national policies that the Philippines government could be pursuing in trying to encourage international recognition of its employment contracts. In addition to requiring remedies for its injured seamen at levels which it has determined are commensurate with its own local standards, the government may be pursuing the equally legitimate goal of expanding maritime employment opportunities for its citizens by providing standardization and predictability of employment practices which is attractive to potential employers (and their insurers) who are trying to estimate cost projections as accurately as possible.
Our view of Prado's objections to being sued in his own homeland can best be summarized by paraphrasing language we previously quoted from Sigalas, 776 F.2d at 1520:
In sum, [Mr. Prado] represents the archetypal foreign plaintiff bringing [his] foreign tort claim to American courts to secure relief more generous that [he] would get under the law of [his] homeland. [The Philippines] has strong contacts with this case. America has virtually none.
We hold that the employment contract between Prado and Asiento is binding and enforceable, including the "forum selection" and "choice of law" provisions.

V. CONCLUSION AND JUDGMENT
In federal court and other jurisdictions, Prado's claim would be disposed of on the basis of forum non conveniens. As both parties are foreign; the injury occurred outside of the United States; we have made a determination that foreign law applies; and that plaintiff has access to a convenient, friendly, foreign forum (that speaks his language) for the application of that law; this case presents an excellent example of the potential usefulness of the doctrine of forum non conveniens should the legislature ever decide to revise LSA-C.C.P. art. 123.
In spite of the fact that Louisiana has no material interest in this cause of action, we are compelled to make some suitable disposition *704 of the case which we will accomplish by resorting to Prado's employment contract rather than forum non conveniens. In making that disposition we are guided by the time honored and oft expressed principle that:
"Seamen, as wards of the court, are entitled to a careful review when a district court refuses to exercise jurisdiction over their claims. We are convinced that federal courts must remain vigilant in protecting the rights of seaman, whether foreign or domestic, in their relations with their employer." Castillo v. Spiliada Maritime Corp., 937 F.2d 240 (5 Cir.1991).
We are equally committed to the proposition that this court should be no less zealous in protecting the rights of seaman. In accordance with this principle we are determined that Prado's ability to recover will not be prejudiced just because he first made a good faith, well argued, diligent, non-frivolous, though unsuccessful attempt to pursue a remedy in Louisiana.
For the foregoing reasons, we order that the judgment below be vacated and that this matter be remanded to the trial court for further proceedings consistent with this opinion. We further order that these proceedings be stayed for six-months from the date of this judgment during which time Prado shall furnish the trial court with satisfactory proof that he has filed his claim in a forum in the Philippines. It is further ordered that if Prado fails to produce satisfactory proof to the trial court of the filing of his claim in the Philippines within the said six months then the trial court may dismiss this claim with prejudice for failure to comply with the "forum selection" provisions of his employment contract. It is further ordered that in the event Prado should produce satisfactory proof to the trial court that Asiento has attempted to frustrate his efforts to pursue this claim in a Philippine forum by raising objections based upon the filing of this claim by Prado first in the United States, including but not limited to objections of jurisdiction, prescription, laches or estoppel, then the trial court may proceed to adjudicate this claim in a manner consistent with this opinion and the law of the Philippines.
JUDGEMENT VACATED PROCEEDINGS REMANDED AND STAYED.
NOTES
[1] Prado produced as exhibits for the court's inspection a plethora of such paperwork. Voluminous as those papers were, they represented only 12 voyages of the Epsilongas. Therefore, we are willing to accept without physical proof plaintiff's conclusion that the aggregation of such documents encompassing all of the Epsilongas' voyages to the United States must be enormous. Our conclusions expressed in the body of this opinion were arrived at after a painstaking review and analysis of Prado's exhibits. We may assume that the trial court did the same when it concluded, as it must have, that Asiento did not have sufficient contacts to warrant the application of United States law.