JOAN BERNARD ARMSTRONG, Chief Judge.
 

 LThe plaintiff, Leonard Keasley, appeals the summary judgment granted by the Workers’ Compensation District 8 Hearing Officer on November 6, 2009, dismissing his claim of permanent and total disability.
 
 [1]
 

 Mr. Keasley filed a disputed claim for workers’ compensation benefits against his employer, Transit Management of Southeast Louisiana (hereinafter TMSEL), on November 7, 2002, arising from an accident on November 5, 1991 in which Mr. Keasley was hurt when moving a box of copy paper.
 
 [2]
 
 TMSEL replied to the claim, noting that Mr. Keasley had received 520 weeks of indemnity benefits, constituting all the benefits to which he was entitled, and was capable of working, and asserting the medical expense off set under La. R.S.
 
 *978
 
 23:1212 and credits under La. R.S. 23:1221(3) and La. R.S. 23:1223.
 

 In June of 2007, counsel for TMSEL withdrew, and new counsel was enrolled. Just over a year later, TMSEL moved for summary judgment, contending that its reduction of Mr. Keasley’s temporary total disability (TTD) benefits to ^supplemental earning benefits (SEB) was proper as a matter of law. TMSEL also moved for summary judgment that Mr. Keasley was not permanently and totally disabled. TMSEL contended that it paid Mr. Keas-ley TTD benefits from November 21, 1991 until June 3, 2000, at which time the benefit was reduced to SEB, which benefits Mr. Keasley received until he reached the statutory maximum in November of 2001. TMSEL based its reduction of benefits from TTD to SEB on the opinions of four physicians that Mr. Keasley was able to return to work. In support of its position, TMSEL provided unsworn statements of Roy R. Marrero, M.D. dated January 6, 1991; A.N. Diodene, Jr., M.D. dated July 9, 1993; Wilmot F. Ploger, M.D. dated October 7, 1994; Harry E. Hoerner, M.D. dated August 27, 1996; and Robert L. Mímeles, M.D. dated February 10, 1998 and January 18, 2000. On October 31, 2008, the Hearing Officer denied TMSEL’s motions for summary judgment. The Hearing Officer issued the following written reasons:
 

 The two Summary Judgment Motions were denied. It is necessary to weigh the evidence to reach a decision. That is appropriate at trial and not Summary Judgment.
 

 On August 11, 2009, TMSEL reurged its motion for partial summary judgment as to Mr. Keasley’s claim of permanent and total disability arising from his 1991 injury. TMSEL contended that new evidence discovered during the taking of Mr. Keasley’s deposition cured the deficiencies that existed when the motion was heard the previous year. Following a hearing, the Hearing Officer granted TMSEL’s unopposed motion for partial summary judgment as to Mr. Keasley’s kidney condition, and granted TMSEL’s opposed motion for partial summary judgment as to Mr. Keasley’s claim for permanent and total disability.
 

 | sMr. Keasley prosecutes the instant appeal from the judgment insofar as it grants the motion for partial summary judgment dismissing Mr. Keasley’s claim for permanent and total disability benefits. Mr. Keasley assigns a single error, contending that the opinion of his treating physician, Bernard Manale, M.D., that he was totally and permanently disabled, creates a genuine issue of material fact, precluding summary judgment. For the reasons that follow, we affirm the judgment of the Office of Workers’ Compensation in part, vacate and set aside the judgment in part, and remand for further proceedings consistent with this opinion.
 

 MEDICAL HISTORY
 

 The record contains copies of reports prepared by physicians and other health care providers setting forth Mr. Keasley’s medical history.
 
 [3]
 
 In July of 1990, Mr. Keasley suffered a moderate to severe lumbar sprain as a result of a non-work-
 
 *979
 
 related automobile accident. His physician, Roy Marrero, M.D., restricted him from work from August 6, 1990 until September 13,1990 for this injury.
 

 Following the 1991 work-related injury, Mr. Keasley again saw Dr. Marrero, on November 5, 1991. Dr. Marrero diagnosed a lumbar spine sprain and instructed Mr. Keasley not to return to work. Dr. Marrero again saw Mr. Keasley on January 6, 1992, and determined that he had fully recovered from his lumbar spine sprain and was ready to return to work without residual effects. Mr. Keasley’s subsequent medical history follows this time-line:
 

 1 ¿October 28, 1992:
 
 [4]
 
 Nearly ten months after having been released to full duty by Dr. Marrero, Mr. Keasley saw Bernard Manale, M.D., of Orleans Orthopaedic Associates (OOA).
 

 June 25, 1993: Orthopedist A.N. Diod-ene examined Mr. Keasley, reviewed his records, and found he was capable of returning to work, but should avoid bending and heavy lifting “for the present time.”
 

 July 12, 1993:
 
 [5]
 
 Dr. Manale restricted Mr. Keasley from work as a result of the 1991 accident.
 

 September 10, 1993:
 
 [6]
 
 Mr. Keasley underwent a CT scan of his lumbar spine that revealed the following impressions: (1) Early Type II protrusion of disc material toward the right of the midline at the L4-5 level; and (2) Degenerative change at L3-4 and L5-S1 levels consisting of Type I annular bulge without evidence of herniations.
 

 October 4, 1993: Mr. Keasley was injured in a non-work-related automobile accident in New Orleans. Dr. Manale examined him, took X-rays, and recommended surgery.
 

 December 3, 1993:
 
 [7]
 
 Mr. Keasley underwent an MRI from The Imaging Center, Inc. that revealed the following impression: “At L3-4 and L4-5, the discs are desiccated compatible with post-traumatic/degenerative disc disease. There is a moderate diffuse annular bulge at both levels, with no evidence of thecal indentation. The lower foraminal fat is slightly [sic] but perineural fat is preserved.”
 

 | sMarch 28, 1994: Mr. Keasley was injured in another non-work-related automobile accident in New Orleans. Mr. Keas-ley filed suit based on the accidents of October 4, 1993 and March 28, 1994. In these suits, he claimed aggravation of his pre-existing back condition.
 
 [8]
 

 July 13, 1994: Mr. Keasley completed a Social Security Administration Disability Report seeking disability benefits. On October 21, 1994, the request was denied.
 

 
 *980
 
 September 12, 1994: Wilmot Ploger, M.D., examined Mr. Keasley and reviewed his medical records in connection with the latter’s application for Social Security Disability (SSD) benefits. At that examination, according to Dr. Ploger’s report dated October 7, 1994, Mr. Keasley said he was injured in a motor vehicle accident in 1991 and had not worked in the past year because of a permanent disability diagnosis from Dr. Manale. Dr. Ploger concluded that Mr. Keasley’s physical examination showed Mr. Keasley’s back was within normal limits and the examination revealed no mechanical dysfunction of the spine or clinical evidence of nerve root irritation. Mr. Keasley’s X-rays were considered normal for a person of his age.
 

 August 27, 1996: Orthopedist Harry Hoerner, M. D., examined Mr. Keasley and reviewed his medical records in connection with the latter’s application for SSD benefits. Once again, according to Dr. Hoerner’s report of even date, Mr. | ^Keasley gave a history of having been involved in an automobile accident. Dr. Hoerner noted that Mr. Keasley told him that he was rear-ended while driving as a courier for the Regional Transit Authority, making deliveries in New Orleans. The report notes that Mr. Keasley told him that he was seen by Dr. Marrero, who took X-rays and prescribed physical therapy. He was then seen and treated by Dr. Manale, who told Mr. Keasley that he had four ruptured discs, and recommended surgery. While Mr. Keasley denied any other injuries or accidents involving his lower back, Dr. Hoerner noted that Dr. Manale’s records reflect that Mr. Keasley reported an automobile accident on March 28, 1994, that did not cause any increased back problems. Dr. Hoerner diagnosed a chronic lumbosacral musculoligamentous strain with degenerative arthritis and degenerative disc disease involving L 1-2, L 4-5, and L5-S1. Dr. Hoerner noted that there was no evidence of nerve root irritation and found inconsistencies with range of motion of Mr. Keasley’s back when he was standing or sitting. Dr. Hoerner concluded that Mr. Keasley was, at that time, capable of at least some type of light to light-medium work where he would have some restrictions, primarily with continuous heavy lifting, long standing, walking, climbing, bending, squatting, stooping, crawling, and kneeling.
 

 December 10, 1996: An SSD hearing was held resulting in a decision on December 13, 1996, granting Mr. Keasley SSD benefits
 
 [9]
 
 based on Dr. Manale’s 17conclusion that Mr. Keasley became permanently and totally disabled on June 14, 1993.
 

 February, 1998: At TMSEL’s request, Robert L. Mimeles, M.D., examined Mr. Keasley and reviewed his medical history, including a September, 1993, CT scan of the lumbar spine, and a December, 1993, MRI. Dr. Mimeles concluded in his report of February 10, 1998, that Mr. Keasley’s history was not indicative of a long-term back injury, and that he had reached maximum medical improvement. Dr. Mimeles opined:
 

 Dr. Marrero released this gentleman to full duty January 6, 1992, for what he thought was a resolved soft tissue strain.
 
 *981
 
 This gentlemen then did not go see Dr. Manale for some ten months. It is my understanding, when talking to this gentleman, that he only worked [sic] for a couple of months after the accident and did not work for the ten months when he was released from Dr. Marrero. He then saw Dr. Manale in October of 1992, then did not see anybody for six more months. This certainly does not sound like any significant back problem to me.... I reviewed the reading of the CT scan which was done in September of 1993, over two years after the accident. This lends itself to some degenerative disc disease at three different levels. There is a bulge to the L4-5 disc. Apparently, Dr. Diodene reviewed this and there is no indication in his reviewing of the CT scan or the radiologist’s reading that there is any compression of any of the neural elements. This is not an unusual reading for somebody 52 years of age who had done heavy work and is somewhat overweight.... I reviewed an MRI performed in December of 1993. There is desiccation degeneration of the L3 and L4 discs with mild bulging but no compression of the neural elements to any extent. This goes along with a CT scan. This gentleman could have long since been back at gainful employment.... He certainly needs no further ongoing care or any other medical treatment.
 

 UNovember 18,1998:
 
 [10]
 
 Mr. Keasley underwent an MRI from Harold Neitzsch-man, M.D., that revealed the following impressions: (1) A very mild bulge of the annulus at the level of L3^4, L4-5, and L5-S1, with no evidence of focal disc protrusion at any of these levels; and (2) some very slight narrowing of the exit foramen at L3-4 and L4-5.
 

 January 18, 2000: Dr. Mímeles again examined Mr. Keasley, and reviewed an MRI taken in November, 1998. He noted that the MRI showed no herniated discs and that Mr. Keasley’s spine was consistent with what was expected of a 59-year old gentleman with degenerative disc disease and degenerative arthritis. He saw nothing to suggest any significant compressed nerve roots. Dr. Mímeles did not believe Mr. Keasley should go back to work involving much stooping, bending, and lifting. He opined, “His [Mr. Keas-ley’s] auto accident dates back to 1991 and obviously this injury, in my opinion, should have settled down some seven to eight years ago.” He concluded that Mr. Keas-ley could do a light duty job, was “certainly not 100% disabled from ever doing anything,” and could have long since been working at some type of modified job.
 

 March 20, 2000: Orthopedist Warren Bourgeois, III, M.D., received an appointment to perform an independent medical examination of Mr. Keasley pursuant to the provisions of La. R.S. 23:1123. On May 2, 2000, he saw Mr. Keasley and issued a report on May 9, 2000. Dr. Bourgeois concluded that Mr. Keasley had degenerative disc disease and lumbosacral spine arthritis consistent with his age. He opined that his physical examination of Mr. Keasley was “consistent with symptom magnification,” and noted no positive findings for nerve |9root impingement. According to Dr. Bourgeois, Mr. Keasley should be capable of modified light duty with no lifting over ten pounds. By Mr. Keasley’s own history, Dr. Bourgeois concluded that Mr. Keasley was able to sit for up to two hours at a time and “certainly alternating sitting and standing he should be able to accomplish modified light activity for six to eight hours a day.” However,
 
 *982
 
 Dr. Bourgeois also opined, “Due to the patient’s age (59) and length of his treatment for his problem, it is unlikely that Mr. Keasley will be able to return to work in any capacity and as such I feel than an FCE would be a waste of time and resources as he will most likely have a skewed evaluation due to symptom magnification.”
 

 December 6, 2000: At TMSEL’s request, Gary Ordes,
 
 [11]
 
 a vocational rehabilitation counselor on the staff of Corvel Corporation, examined Dr. Bourgeois’ report and performed a Labor Market Survey (LMS) in which he contacted employers with job openings that were within the limitations proposed by Dr. Bourgeois. Mr. Ordes sent the results of his survey to Dr. Bourgeois for his approval, which was granted, and mailed copies of the report to Mr. Keasley and his attorney by certified mail. Mr. Ordes did not verify that Mr. Keasley did or did not contact any of the potential employers identified in the LMS.
 

 January 8, 2001: Mr. Ordes conducted another LMS, certified by Dr. Bourgeois, and mailed the survey to Mr. Keasley and his attorney. Mr. Ordes identified a Job Contact Log completed by Mr. Keasley dated January 23, 2001, indicating that he applied for the jobs indicated on the log. Mr. Ordes also identified a Job Contact Log completed by Mr. Keasley dated February 13, 2001, indicating there were no openings for the jobs. According to Mr. Ordes, he had no | inway of knowing whether or not Mr. Keasley in fact applied for these jobs. Mr. Ordes noted that, since he had not seen Mr. Keasley for more than two years, he had no opinion concerning his current disability status.
 

 January 9, 2002:
 
 [12]
 
 Mr. Keasley underwent an MRI from The Louisiana Clinic that revealed the following impressions: (1) A mild diffuse (Type I) bulge at L3^1, with a desiccated disc. The disc effaces lower foraminal fat bilaterally; (2) At L4-5, the disc is desiccated and mildly effaces lower foraminal fat; the annulus is mildly prominent (a minimal Type I bulge); and (3) At L5-S1, the disc is desiccated but normal in axial contour (Type 0 change).
 

 March 5, 2002: Dr. Manale saw Mr. Keasley for the last time and did not change his opinion of July 12, 1993 that Mr. Keasley was totally disabled.
 

 July 31, 2003: Mr. Keasley saw Kenneth Adatto, M.D., Dr. Manale’s associate at OOA, on July 28, 2003. Dr. Adatto noted in his report of July 31, 2003, that Mr. Keasley has a total and permanent disability, reflected in an anatomical ten to fifteen percent disability of the lumbar spine. He noted that Mr. Keasley “needs to avoid prolonged sitting or standing in the same position for 45 minutes, plus/minus 15 minutes without being able to move around and change position. The disability and restrictions are the same with or without surgery.” He defined Mr. Keasley’s disability status as “total permanent spinal disability,” and instructed him to return in three months.
 

 August 13, 2003: A physician
 
 [13]
 
 examined Mr. Keasley to determine his ability to perform his duties with the Catholic Charities Foster Grandparent | n Program.
 
 *983
 
 According to the report of this examination found in the record, Mr. Keasley indicated that his last physical examination was in that year, 2003, when he was hospitalized for heart pain. He checked the form, claiming the following ailments: back injury, high blood pressure, and heart disease, and explained that he had physical limitations to the lower part of his back, which he attributed to a 1996 accident at work.
 
 [14]
 
 The examining physician concluded that Mr. Keasley was medically able to participate in the activities of the program.
 

 February 5, 2004: Dr. Adatto electronically signed a report of his examination of Mr. Keasley, noting a ten to fifteen percent permanent impairment of Mr. Keas-ley’s lumbar spine. This same notation was made following examinations on May 4, 2004; August 3, 2004; November 8, 2004; January 6, 2005; and March 3, 2005. While noting an
 
 anatomical impairment
 
 of ten to fifteen percent of the lumbar spine, these subsequent reports do not seem to contradict Dr. Adatto’s initial finding of total and permanent
 
 disability
 
 in July of 2003.
 

 April 28, 2005 and July 28, 2005: Dr. Adatto assigned to Mr. Keasley the following working/impairment status: “ACTIVITY/FUNCTIONAL LIMITATIONS: The patient needs to avoid repetitive stooping or bending, repetitive lifting of objects over 10-20 pounds as well as prolonged sitting or standing in the same position for 45 minutes, plus/minus 15 minutes without being able to move around and change position. These restrictions are the same with or without surgery. KNEE: Avoid repetitive or prolonged standing, walking, squatting, crawling, kneeling or walking on uneven surfaces. PERMANENT ANATOMICAL IMPAIRMENT: 10-15% OF THE LUMBAR SPINE.”
 

 | ^October 31, 2005:
 
 [15]
 
 Following his relocation to Lafayette, Louisiana following the failure of the New Orleans area’s federal flood walls and levees two months earlier, Mr. Keasley saw Dr. John Cobb of the Louisiana Bone and Joint Clinic in Lafayette. On Mr. Keasley’s complaint of back pain and radiating pain down his left leg into his foot, Dr. Cobb made a diagnosis of multiple level degenerative disc disease, disc related problems of the lumbar spine, and intermittent radiculitis. Mr. Keasley missed the next four appointments with Dr. Cobb.
 

 April 22, 2009:
 
 [16]
 
 Mr. Keasley returned to Dr. Cobb, stating that he had not been treated for his lower back issues since October of 2005, and had retired from employment. Dr. Cobb recommended and TMSEL authorized another MRI.
 

 In addition to Mr. Keasley’s back problems, he testified at his July 25, 2009 deposition that he is under treatment for kidney problem unrelated to his employment with TMSEL. The treatment includes monthly visits to Dr. Ashkey Gupta and kidney dialysis three times each week. He also testified to having received treatment at University Medical Center for a congenital abnormal heartbeat. Mr. Keasley testified that only his back condition is related to his 1991 on-the-job injury.
 

 WORK HISTORY POST-ACCIDENT
 

 In Answers to Interrogatories served on March 14, 2008, Mr. Keasley described his
 
 *984
 
 employment outside the Regional Transit Authority since his work-related injury in 1991 as follows:
 

 |1¾... [F]or approximately 12 months or so, the claimant did some charity work for the Urban League Street Academy (through the Catholic Charities Association) where he received sort of a per diem payment. He was allowed to come and go as he desired. There was no penalty for not showing up. While there he checked in with the principal of the school.... The hours that he tried to go were from 9:00[sic] a.m. to l:00[sic] p.m. He received a per diem payment of $2.50 an hour or $10.00. No taxes were taken out. While there he talked to children with social problems. Around 2003 or 2002 he assisted at Family Helpers, an organization for handicapped children. Again he received a small payment that he believes was similar to the payment by the Catholic Charities. Basically a child would stay at his house some afternoons.
 

 At his 2008 deposition, Mr. Keasley testified that he helped out at the Urban League Street Academy, near the St. Bernard housing development, when he was living in New Orleans. He was not able to specify the dates he worked, but thought it was in either 2003 or 2004 and part of 2005. He testified that he did not have any expenses in connection with his work. Mr. Keasley’s work consisted of sitting with a four-year old child while he did his school work. He worked from eight in the morning
 
 [17]
 
 until noon, during the regular school term. He testified that he was paid $3.20 or $3.25 per hour for his services, which he corrected later in his testimony to $2.50 per hour.
 

 Mr. Keasley testified that he also worked for the Family Helpers organization in New Orleans East for about six months. In that connection, he baby-sat a mentally handicapped child at the Keasley home. Mr. Keasley testified that he was paid for his services by check from the organization and by the child’s mother. He took care of the child for about two hours in the afternoon during the school year, and he was paid based on the number of hours the child stayed at Mr. 114Keasley’s home. He verified earnings of $3,504.04 in 2003 and $2,592.55 in 2004. He also testified that he worked for Holy Family School in Lafayette for about four or five months in 2006, with duties and hours similar to his job with the Urban League Street Academy in New Orleans. He stopped working because of continuing problems with his back. He earned something more than two dollars per hour, and was allowed to work at most four hours per day. Mr. Keasley testified that he was compensated for his time and services.
 

 Mr. Keasley’s Federal Income Tax Return Form 1040A for 2003 and its attached Form W-2 shows wage income for that year in the amount of $3,504. His Federal Income Tax Return Form 1040EZ for 2004 and its attached Form W-2 show wage income for that year in the amounts of $2,594 and $2,593.55, respectively.
 
 [18]
 
 During the course of Mr. Keasley’s July 21, 2009 deposition, he admitted that in 2006, during his relocation to Lafayette, he worked for Catholic Charities at Holy Family School, providing the same services he performed for Catholic Charities in
 
 *985
 
 New Orleans. He was compensated for his time and services, but not for his expenses. He testified that he depended on this compensation to supplement his pension and disability income. Mr. Keasley provided no verified evidence to controvert this record of his post-injury work and compensation.
 

 It is clear that Mr. Keasley’s benefits were terminated in November of 2001, at which point Dr. Manale had opined he was unable to work because of his work-related back injury. The issue on TMSEL’s motion for summary judgment is whether and when Mr. Keasley’s employment for the various charities disqualified |1ñhim from receiving total disability benefits. There is no evidence that Mr. Keasley will be unable to prove by clear and convincing evidence that he was totally disabled, as that phrase is understood in the applicable statute, from November, 2001, until he began his compensated work for the charities. The Internal Revenue forms demonstrate that Mr. Keasley worked for wages in 2003 and 2004. Because the forms do not specify the dates of Mr. Keasley’s employment, we refer to the personnel files offered by TMSEL and made part of the record. Mr. Keasley’s applied to participate in the Foster Grandparent Program on July 10, 2003, and was examined by a physician on August 15, 2003 as part of his application. The file also contains letters of personal recommendation dated July 21, 2003, August 19, 2003, and July 10, 2003. Mr. Keasley’s Health Education Department orientation is dated August 14, 2003, and his file contains a receipt showing that he received his Foster Grandparent Program handbook on August 12, 2003. This record is inconclusive as to the exact day on which he began to work for wages in 2003. Mr. Keasley testified that he evacuated to Lafayette in the aftermath of the August, 2005 levee and floodwall failures in New Orleans, from which we infer that he may be able at trial to prove by clear and convincing evidence that he did not work for wages from sometime in August of 2005 until sometime late in 2006.
 

 Shanese L. Lewis, director of the Lafayette program, by letter dated September 2, 2009, advised TMSEL’s counsel that Mr. Keasley was “enrolled as a volunteer from September 25, 2006 through May 29, 2007.” His Assignment Plan, indicating what his duties were to be, is dated October 25, 2006. His 2006-2007 Leave Record indicates that he earned eight hours of leave in October, and November of 2006, and in January of 2007. Time sheets show that he was paid |lf,$42.40 plus mileage of $11.52 from July 17, 2006 to July 21, 2006, prior to his enrollment. The time sheets record that he worked on September 25 and 26, 2006, and from October 2, 2006 through February 27, 2007 The termination notice, dated May 29, 2007 indicates that he was terminated in compliance with a policy that stipulates that an absence of thirty or more days means that the program could not retain a position for him. The file also contains Dr. Gupta’s letter dated April 17, 2007, indicating that Mr. Keasley was then able to return to participate in the program on May 7, 2007.
 

 There is no indication as to the exact date when Mr. Keasley began to work for wajfes in Lafayette, or the exact date when he last worked. Since he was paid only for those hours when he actually performed services for the program, under the facts of record, there are genuine issues as to when Mr. Keasley began and stopped working for wages in the Lafayette program.
 

 While we have reviewed the reports of Doctors Marrero, Diodene, Ploger, Hoer-ner, Mímeles, and Bourgeois that were admitted into evidence without objection, we have not considered those unverified statements mentioned in TMSEL’s Pre
 
 *986
 
 Trial Statement that are purportedly supported by exhibits that are not a part of the record, except insofar as the medical testing referred to therein is mentioned in the aforesaid medical reports.
 

 Appellate courts review summary judgments
 
 de novo,
 
 using the same criteria applied by trial courts to determine whether summary judgment is appropriate.
 
 Independent Fire Ins. Co. v. Sunbeam Corp.,
 
 99-2181, 99-2257, p. 7 (La.2/29/00), 755 So.2d 226, 230-31. The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of actions such as this. The procedure is favored and shall be construed to accomplish these ends. La.Code 117Civ. Proc. art. 966 A. (2). A summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. La.Code Civ. Proc. art. 966 B. The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the mov-ant’s burden on the motion does not require him to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
 
 Id.;
 
 La.Code Civ. Proc. art. 966 C. (2).
 

 An adverse party to a supported motion for summary judgment may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided by law, must set forth specific facts showing that there is a genuine issue of matezial fact for trial. La.Code Civ. Proc. art. 967;
 
 Townley v. City of Iowa,
 
 97-493, p. 5 (La.App. 3 Cir. 10/29/97), 702 So.2d 323, 326.
 

 The amended article 966 substantially changed the law of summary judgment. Under the prior jurisprudence, summary judgment was not favored and was to be used only cautiously and sparingly. Under the amended statute, the initial burden of proof remains with the mover to show that no genuine issue of material fact exists. However, under La. Code Civ. Proc. art. 966 C., once the mover has made a
 
 prima facie
 
 showing that the motion should be granted, the burden shifts to the non-moving party to present evidence demonstrating that Immaterial factual issues remain. Once the mover has properly supported the motion for summary judgment, the failure of the non-moving party to produce evidence of a material factual dispute mandates the granting of the motion.
 

 Argument of counsel and briefs, no matter how artful, are not sufficient to raise a genuine issue of material fact. La. Code Civ. Proc. art. 967;
 
 Cox Cable New Orleans, Inc. v. City of New Orleans,
 
 94-2102, p. 4 (La.App. 4 Cir. 11/16/95), 664 So.2d 742, 744. Despite the presence of disputed facts, summary judgment will be granted as a matter of law if the contested facts present no legal issues.
 
 Davenport v. Amax Nickel, Inc.,
 
 569 So.2d 23, 27 (La.App. 4 Cir.1990).
 

 A fact is
 
 material
 
 if it is essential to a plaintiffs cause of action under the applicable theory of recovery and without which plaintiff could not prevail. Generally, material facts are those that potentially insure or preclude recovery, affect the litigant’s ultimate success, or determine the outcome of a legal dispute.
 
 Prado v. Sloman Neptun Schiffahrts, A.G.,
 
 611 So.2d 691, 699 (La.App. 4th Cir.1992).
 

 
 *987
 
 Mr. Keasle/s claim to total and permanent disability is governed by La. R.S. 23:1221, which provides in relevant part:
 

 Compensation shall be paid under this Chapter in accordance with the following schedule of payments:
 

 ⅜ * ⅜
 

 (2) Permanent total.
 

 (a) For any injury producing permanent total disability of an employee to engage in
 
 any self-employment or occupation for wages, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured, and whether or not an occupation for which the employee at the time of injury was particularly fitted by reason of education, training, and experience,
 
 sixty-six and two-thirds percent 119of wages during the period of such disability. [Emphasis supplied.]
 

 (b) For purposes of Subparagraph (2)(a) of this Paragraph, compensation for permanent total disability
 
 shall not be awarded if the employee is engaged in any employment or self-employment regardless of the nature or character of the employment or self-employment including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in any pain.
 
 [Emphasis supplied.]
 

 H. Alston Johnson, III, in the Louisiana Civil Law Treatise series, notes:
 

 There is no question but that this language was intended to make awards for total and permanent disability very difficult to obtain, and indeed almost nonexistent. Any injured worker who returns to work in any capacity and in whatever degree of pain will probably not be totally and permanently disabled.
 

 13 La. Civ. L. Treatise,
 
 Workers’ Compensation Bate and Practice
 
 § 275 (4th ed.).
 

 The statute also sets forth the relevant burden of proof:
 

 (c) For purposes of Subparagraph (2)(a) of this Paragraph, ... compensation for permanent total disability shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment, including, but not limited to, any and all odd-lot employment, sheltered employment, or employment while working in any pain,....
 

 Thus, Mr. Keasley would bear the burden at trial of proving, by clear and convincing evidence, that he is unable to engage in any employment of any nature.
 
 See Buxton v. Iowa Police Dep’t,
 
 09-0520, p. 21 (La.10/20/09), 23 So.3d 275, 288-89;
 
 DeGrasse v. Elevating Boats, Inc.,
 
 98-1406, pp. 5-6 (La.App. 4 Cir. 3/10/99), 740 So.2d 660, 663-64.
 

 One of the primary goals of the Louisiana Workers’ Compensation Act is to provide protection to workers and to keep the injured employee and his or her lanfamily from destitution. In light of the policies behind the Act, the Louisiana Supreme Court has adopted special rules for interpreting its provisions such that to effectuate the remedial policy of the Act, its provisions should construed liberally in favor of the compensation claimant.
 
 Breaux v. Hoffpauir,
 
 95-2933, p. 4 (La.5/21/96), 674 So.2d 234, 237, citing
 
 Pinkins v. Cardinal Wholesale Supply, Inc.,
 
 619 So.2d 52, 55 (La.1993).
 

 As this Court noted in
 
 Zanca v. Exhibition Contractors Co.,
 
 614 So.2d 325, 328 (La.App. 4th Cir.1993), concerning a claim for temporary total disability:
 
 [19]
 

 
 *988
 
 Although this Court recognizes that compensation cases are to be liberally construed in favor of the employee, we are also mindful of the fact that the burden for establishing entitlement to temporary total benefits rests on the plaintiff. By amending the provisions of La. R.S. 23:1221(l)(c) to specifically state [sic] that benefits can be awarded only if the employee proves that he cannot engage in any employment, regardless of the nature and regardless of whether such employment can be performed while working in any pain, the Legislature has effectively eliminated all but the most disabled employees from receiving temporary total disability benefits. While the wisdom or fairness of the amending legislation may be questioned, this Court is bound to apply the law as enacted by the Legislature.
 

 Based on the record presented to the trial court in connection with TMSEL’s motion for summary judgment, it is clear that Mr. Keasley will not be able to bear the statutory burden of proof as to parts of the years 2003 and 2004, 2006, and 2007, where the evidence is uncontroverted that he worked for wages. The very strict legislative pronouncement contained in La. R.S. 23:1221 compels us to conclude that Mr. Keasley’s efforts to supplement his pension and disability income with the minimal earnings he received during those years precludes his qualifying for permanent total disability during that period. However, it is equally |2i clear that on the record before us, including the various medical reports, there are genuine issues of material facts as to Mr. Keasley’s disability status before he re-entered employment for wages in 2003 and after he left such employment in 2007, and to the exact time periods in the interim during which he was ineligible for total disability benefits. Therefore, we affirm the trial court’s judgment insofar as it grants summary judgment for the period when it is uncon-troverted that Mr. Keasley worked for wages, and remand the case for further proceedings consistent with this opinion.
 

 AFFIRMED IN PART, VACATED AND SET ASIDE IN PART, AND REMANDED.
 

 [1]
 

 . The Hearing Officer also granted an unopposed Motion for Partial Summary Judgment relative to Mr. Keasley's alleged kidney condition. That portion of the judgment of November 6, 2009 is not at issue in this appeal.
 

 [2]
 

 . The medical histories given by Mr. Keasley to his doctors variously describe his injury as having occurred when he was moving a box of copy paper, and when the car he was driving on a work-related errand was rear-ended.
 

 [3]
 

 . The medical reports contained in the record are not certified by affidavit; however, the following reports were admitted without objection at the hearing: January 6, 1992 from Roy R. Marrero, M.D.; July 9, 1993 from A.N. Diodene, Jr., M.D.; October 7, 1994 from Wilmot F. Ploger, M.D.; August 27, 1996 from Harry E. Hoerner, M.D.; February 10, 1998 and January 18, 2000 from Robert L. Mimeles, M.D.; May 9, 2000 from Warren R. Bourgeois, III, M.D.; Job Analyses dated January 8, 2001, signed by Dr. Bourgeois with copies of certified transmittal letters from Gary J. Ordes, LRC, CRC, MHS to Mr. Keas-ley and his counsel, and to Dr. Bourgeois.
 

 [4]
 

 . This information appears in the record only as part of TMSEL’s Pre-Trial Statement and is not verified. The statement refers to Exhibit 14, which does not appear in the appellate record.
 

 [5]
 

 . See footnote 4, supra.
 

 [6]
 

 . This information appears in the record only as part of TMSEL’s Pre-Trial Statement and is not verified. The statement refers to Exhibit 23, which does not appear in the appellate record.
 

 [7]
 

 . This information appears in the record only as a part of TMSEL’s Pre-Trial Statement. It is not verified and refers to Exhibit 24, which does not appear in the appellate record.
 

 [8]
 

 .In his March 27, 2003 deposition, taken in connection with this workers' compensation claim, Mr. Keasley was asked if he had been involved in any accidents subsequent to the 1991 work-related injury. He disclosed the October 4, 1993 injury and denied that it aggravated his back injury, noting that the case was settled. Mr. Keasley on deposition did not disclose the March 28, 1994 accident. In his 2008 deposition, he denies any injuries subsequent to the 1991 accident.
 

 [9]
 

 . The record contains a statement from the Social Security Administration (SSA) dated February 11, 2003, indicating that, beginning in December of 2002, Mr. Keasley's full monthly SSD benefit was $879.10, subject to a $58.70 deduction for medical insurance premiums. The record contains a letter from the SSA dated June 8, 2005, increasing his benefit to $921.70, subject to a $78.20 deduction for medical insurance premiums. The record contains a copy of a letter from the SSA dated November 3, 2006, advising Mr. Keasley that his benefit was increased to $939, effective May 2006.
 

 [10]
 

 . This information appears in the record only as a part of TMSEL’s Pre-Trial Statement. It refers to Exhibit 25 which does not appear in the appellate record.
 

 [11]
 

 . Mr. Ordes testified by deposition taken on August 5, 2003, a copy of which was submitted in support of TMSEL's motion for partial summary judgment.
 

 [12]
 

 . This information is unverified, and appears in the record only as part of TMSEL's PreTrial Statement. The underlying MRI report is identified as "Exhibit 26”, but is not made a part of the record.
 

 [13]
 

 .The physician’s signature on the Volunteer Medical Examination form, dated august 15, 2003, is illegible. It appears to be T.G. Ood-erly, M.D.
 

 [14]
 

 . We note that his only work-related accident took place in 1991.
 

 [15]
 

 . This information is unverified and is found only in TMSEL's Pre-Trial Statement. It refers to Exhibits 4-C and 30, which are not part of the appellate record. In his answers to interrogatories filed in 2008, Mr. Keasley noted that he saw Dr. Cobb in 2006 and 2007.
 

 [16]
 

 .This information is unverified and is found only in TMSEL’s Pre-Trial Statement. It refers to Exhibits 30 and 31, which are not part of the appellate record.
 

 [17]
 

 . At the deposition, Mr. Keasley specifically corrected his answer to interrogatory in which he had said he worked from nine until noon.
 

 [18]
 

 . The record contains a copy of Internal Revenue Service Form 13873-1 indicating that the agency was unable to provide tax information for 1999, 2000, 2001, 2002, 2005, and 2006, and could find no record of a return having been filed for those years.
 

 [19]
 

 . The statute provides the same standard for total disability in the case of both temporary and total disability claims,